**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| LAWRENCE CHESLER and<br>JACQUELINE CHESLER,<br><br>   Plaintiffs,<br><br> v.<br><br>RICHARD M. CONROY, ANA CONROY<br>FRANCIS C. ANSEL III, and 1327<br>DEARBORN CONDOMINIUM<br>ASSOCIATION, INC.,<br><br>   Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

```
FILED:   MAY 9, 2008
08CV2679  NF
JUDGE KENDALL
MAGISTRATE JUDGE COLE
```

Case No. _____

**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiffs Lawrence Chesler and Jacqueline Chesler, by and through their attorneys, for their Complaint against Richard M. Conroy, Ana Conroy, Francis C. Ansel III and the 1327 Dearborn Condominium Association, Inc., state as follows:

## PARTIES & JURISDICTION

1. Plaintiff Lawrence Chesler ("Larry") is an Illinois citizen residing at 1327 N. Dearborn Parkway, Unit 3, Chicago, Illinois 60610, and an owner of Unit 3 of the 1327 Dearborn Condominium. As of the date of this filing, Larry is 71 years old. Larry is a licensed attorney and has been elected to serve on the boards of several legal associations and civic organizations, including election as a fellow of the New York Bar Foundation.

2. Plaintiff Jacqueline Chesler ("Jackie") is an Illinois citizen residing at 1327 N. Dearborn Parkway, Unit 3, Chicago, Illinois 60610, and an owner of Unit 3 of the 1327 Dearborn Condominium. As of the date of this filing, Jackie is 66 years old. Jackie is heavily involved in the Gold Coast Neighbors Association as a member of the North Dearborn Board of

Directors and has devoted much of her free time and energy to various charitable organizations, including PAWS (the "Pets Are Worth Saving" organization) and the Chicago Animal Shelter Alliance. Jackie also writes for the Chicago Loop News.

3.      Defendant Richard M. Conroy ("Richard") is an Illinois citizen residing at 1327 N. Dearborn Parkway, Unit 1, Chicago, Illinois 60610, and an owner of Unit 1 of the 1327 Dearborn Condominium. Upon information and belief, Richard Conroy is 39 years old.

4.      Defendant Ana Conroy ("Ana") is an Illinois citizen residing at 1327 N. Dearborn Parkway, Unit 1, Chicago, Illinois 60610, and an owner of Unit 1 of the 1327 Dearborn Condominium. Upon information and belief, Ana Conroy is 36 years old.

5.      Defendant Francis C. Ansel III ("Frank") is an Illinois citizen residing at 1327 N. Dearborn Parkway, Unit 2, Chicago, Illinois 60610, and at all times relevant herein was the owner of Unit 2 of the 1327 Dearborn Condominium.[1] Upon information and belief, Frank Ansel is 60 years old.

6.      1327 Dearborn Condominium Association, Inc. (the "Association") is a condominium association.  The Association was organized as a not-for-profit corporation in 1978 for the purpose of operating the property located at 1327 N. Dearborn Parkway, Chicago, Illinois 60610 (the "Condo Property") as a condominium subject to the provisions of the Illinois Condominium Property Act, 765 ILCS 605, *et seq*. The Association's principal place of business is located at 1327 N. Dearborn Parkway, Chicago, Illinois 60610.

7.      This Court has original jurisdiction over the Fair Housing Act claims alleged herein under 28 U.S.C. § 1331 and the Fair Housing Act, 42 U.S.C. § 3601 *et seq*. The Court has

[1] Upon information and belief, the sale for Unit 2 of the 1327 N. Dearborn Condominium on or about April 30, 2008.

pendent and supplemental jurisdiction under 28 U.S.C. §1367 over the related state statutory causes of action and common law causes of action.

8.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)(1) and (2). The United States District Court is the sole venue for a lawsuit under the Fair Housing Act.

## COMMON ALLEGATIONS

9.    The property located at 1327 N. Dearborn Parkway in Chicago, Illinois is a 117 year-old limestone building designated by the Landmark Preservation Council of Illinois as a preservation landmark.  The property was originally a single family home, but was converted to a 3 unit condominium almost 30 years ago.

10.    The individual condo units and the Condo Property as a whole are very valuable. Upon information and belief, the condo unit most recently transferred (Unit 1 was purchased by Richard and Ana Conroy in 2005) was purchased for more than $900,000.

11.    The Declaration of Condominium Ownership and By-Laws, Easements, Restrictions and Covenants of 1327 Dearborn Condominium (the "Declaration") was recorded in or around October 1979, and thereafter amended from time to time.  A fair and accurate copy of the Declaration, including all amendments, is attached hereto as Exhibit A.

12.    Frank purchased Unit 2 of the Condo Property in or around July 1994.

13.    Larry and Jackie (collectively, the "Cheslers") purchased Unit 3, including ownership and exclusive access to the rooftop deck of the Condo Property, in or around March 2003.

14.    Richard and Ana (collectively, the "Conroys") purchased Unit 1 of the Condo Property in or around April 2005.

15.     As set forth in the Declaration, the Property's common area includes part of the ground level, including the first floor foyer, the front stairway leading to the front entrance foyer for Units 2 and 3, the rear entrance and the stairway leading to part of the ground level, the rear doors of Units 1, 2, and 3, the front yard and the parking area.

16.     In January 2006, Richard Conroy was elected president of the Association, Frank Ansel was elected Treasurer of the Association and Jackie Chesler was elected Secretary of the Association.

17.     From January 2006 forward, Richard Conroy and Frank Ansel effectively have excluded the Cheslers from the business and operations of the Association.

18.     Despite accepting appointment as the Association's Treasurer, Frank Ansel abdicated responsibility for the Association accounts and gave the Association checkbook to Richard Conroy.

19.     Despite repeated objections and complaints by the Cheslers, Richard Conroy still retains exclusive custody and control of the Association checkbook to this day, and has failed to respond to the Chesler's many demands that he give them access to the Association accounts and relinquish his exclusive control of the Association checkbook.

20.     Since January 2006, Richard Conroy and Frank Ansel purported to conduct the business and would expend the funds of the Association based upon telephone calls, emails and notes they exchanged, without holding any formal or noticed Association board meetings.

21.     The Cheslers repeatedly objected to the manner in which Richard Conroy and Frank Ansel were purporting to conduct the business of the Association Board (hereafter referred to as the "Conroy/Ansel-Controlled Board"), and to the fact that Richard Conroy failed and refused to call any Association board meetings for a period of two years.

22.     Since purchasing Unit 1 of the Condo Property in the Spring of 2005, Richard and Ana Conroy also have exercised control over the ground level common areas of the Condo Property, including the entry foyer, the back entrance and the front yard and parking area, as if those common areas were owned and controlled solely by the Conroys, repeatedly making additions and alterations upon their own discretion, without proper approval or authorization of the Association and despite the fact that such improvements and alterations were not allowed by the Association's annual budget or any special assessment.

23.     After the Conroys had engaged in a pattern of improving and altering the common areas without proper Association authorization, the Cheslers informed the Conroys that the Conroys were not authorized or empowered to make unilateral decisions with respect to the Condo Property common areas.

24.     Although the Conroys acknowledged that no unit owner was entitled to exercise unilateral control or to make unilateral decisions with respect to the Condo Property common areas, Ana and Richard Conroy continued to exercise control over the foyer and the other ground level common areas of the Condo Property as if those common areas were owned and controlled solely by the Conroys.

25.     After the Cheslers objected to the Conroy's unilateral alterations of the Condo Property common areas, Ana Conroy also became openly hostile to the Cheslers and began to engage in affirmative acts of malice against the Cheslers.

26.     In 2004, due to chronic back problems, Larry was issued a handicapped parking permit. The City of Chicago designated a handicap parking spot in front of 1327 N. Dearborn Parkway specific to Larry.

27.    In May 2006, at the age of 69, Larry underwent major spinal surgery (the fusion of 5 vertebrae), requiring that he be placed in a brace for 23 of 24 hours each day for three months and rendering him almost completely immobile.

28.    Jackie informed Frank and the Conroys that her husband would have difficulty moving because of his condition and asked them to help maintain a clean and dry environment in the common areas so that her husband could move safely throughout the Condo Property walkways and stairwells.

29.    Rather than comply with this request, Ana Conroy took this opportunity to make it even more difficult for Larry Chesler to maneuver through the common areas.  Among other actions, Ana hosed down the front steps at least twice daily, over the repeated objections of the Cheslers. She would then remove the rug that Jackie placed over the wet steps as Jackie went to assist her disabled husband to and from his handicapped parking spot in front of the building.

30.    In July 2006, when the temperature was in the 90's and while Larry was still required to wear his immobilizing brace for 23 hours each day, Ana Conroy complained that Frank Ansel's air conditioner was leaking condensation, and threatened to have the electricity for the entire building turned off unless Jackie gave the Conroys the keys to Mr. Ansel's unit (which she did not have).

31.    When Jackie objected to Ana Conroy that such an action would cause the Cheslers undue hardship because Larry was home sick and immobilized, Ana responded that Jackie would just have to move Larry somewhere else.

32.    Ana Conroy knew that, if she followed through on her threat to turn off the building electricity, she would cause significant discomfort and possible injury to Larry Chesler.

33.     Ana Conroy knew at the time she made this threat that the threat would cause both Jackie Chesler and Larry Chesler severe emotional distress.

34.     In the circumstances that existed at the time, Ana Conroy's threat to turn off the building's electricity was extreme and outrageous, and would be considered extreme and outrageous to a reasonable person.

35.     For several weeks, the Cheslers lived in fear that their power would be cut at any moment while Larry was incapacitated on the third floor.

36.     Ana and Richard Conroy have engaged in numerous additional acts that created and perpetuated a hostile housing environment with the intent of harassing and intimidating the Cheslers, as well as interfering with the Chesler's use and enjoyment of their home and common elements, including without limitation:

(a)     hiding and throwing away much of the U.S. Mail received by the Cheslers, until the Cheslers reported such tampering with their mail to the postal authorities;

(b)     Continuously removing and hiding salt containers used to melt ice buildup at the entrances of the Condo Property;

(c)     During winter, purposely directing the snow removal service to shovel snow into Larry's handicap parking spot located at the front of the building;

(d)     Harassing the Cheslers' guests, including:

i)     Making it hazardous for the Cheslers guests to enter the front stairway, by constantly hosing down the stairway and removing entry mats;

ii)     Demanding and petitioning that the Cheslers' guests use the back stairway during the Annual Dearborn Garden Walk, and failing and refusing to

allow the Association to remedy hazards at the back entry, including poor lighting and burnt out light bulbs in the back stairwell;

iii)     Having cars belonging to guests of the Cheslers parked in the Cheslers' reserved parking space towed; and

iv)     Placing garbage cannisters behind cars of the Chesler's guests;

(e)     Removing notes and signage put up by the Cheslers to inform guests and delivery persons that the buzzer and intercom system to the Cheslers' unit was not functioning;

(f)     Depositing a shovel of dirt on the backdoor of the Cheslers' unit;

(g)     Directing the Association's cleaning and maintenance staff to not comply with requests from the Cheslers (such as replacement of bulbs in the back stairwell) unless such requests were first approved by the Conroys, and then refusing to approve all such requests.

37.     The Cheslers have complained about the hostile housing environment created by the Conroys to Frank Ansel and the Conroy/Ansel-Controlled Board, but their complaints have been ignored and the harassment continues.

38.     On September 06, 2006, Jackie and Larry returned home with their daughter and grandchildren (who were visiting from Massachusetts) to find Ana Conroy installing new decorative lighting in the common area front yard of the Condo Property.

39.     The new lighting purchased by Ana had not been submitted to or approved by the Association, nor were they authorized under the annual budget or in any special assessment.

40.     Jackie explained to Ana that she was not permitted make such changes to the common areas or expend Association funds without prior approval of the Association and the

8

other unit owners, and attempted to move the lights into the Condo Property storage area until the issue could be addressed by the Association.

41.    Ana became enraged, began wildly gesticulating and swearing, and then assaulted Jackie, forcibly and violently grabbing and twisting Jackie's arm, causing Jackie severe pain and bruising.

42.    At the time of the assault, Jackie was 64 years old and Ana was 35 years old.

43.    Ana's foregoing acts of assault and battery were committed with deliberate violence and oppression against an elderly woman almost thirty years her senior.

44.    As a direct and proximate consequence of this assault and battery, Jackie suffered both physical and mental damages, has sought both medical and psychiatric treatment and has suffered from elevated blood pressure (hypertension) ever since the battery.

45.    Along with severe bruising, Jackie's physician diagnosed Jackie with having post-traumatic stress as a result of Ana's assault and battery upon her.

46.    In order to relieve the stress caused by the assault, Jackie's physician prescribed anti-anxiety medication and advised Jackie to avoid contact with Ana Conroy for an extended period of time, requiring Jackie to stay away from her own home from November 2006 to January 15, 2007.  During that time, Jackie was forced first to stay in hotels and then traveled to stay near family members in Scituate, Massachusetts, where the Cheslers rented a home for $2500 per month.

47.    Jackie incurred several thousand dollars in medical bills and thousands of dollars in travel and temporary housing expenses as a direct and proximate consequence of Ana Conroy's assault and battery upon her.

48.     At the same time that Richard and Ana Conroy were expending Association funds for personal projects that were not authorized under the annual budget or in any special assessment, they were refusing to maintain and repair necessary common elements of the Condo Property and refused to pay assessments for Condo Property projects that had been approved even before they purchased Unit 1.

49.     In 2004, the Unit Owners (including Joseph Zweig, the prior owner of Unit 1) unanimously approved a project to renovate the front common area stairs and foyer leading to Units 2 and 3.  Each Unit Owner initially paid $3,000 as a special assessment toward this project, and the Association estimated that an additional $9,000 would be required to complete the project.

50.     After the Conroy's purchased Unit 1, they refused to pay any portion of the already-approved project to renovate the front common area stairs and foyer leading to Units 2 and 3, and demanded that Units 2 and 3 pay the entire remaining cost of those renovations.

51.     At the same time, the Conroys demanded that renovations to the entry foyer to the Condo Property, which the Association had planned to renovate only after the renovation of the stairs and foyer to Units 2 and 3, be completed prior to any other renovations.  Although these improvements were not yet authorized in any special assessment and were not part of the authorized annual budget, the Conroys took the lead in spending $3,500 of Association funds, without any special assessment, to renovate the entry foyer.

52.     Although they were expending Association funds for this project, the Conroys excluded the Cheslers from the decisions regarding the design and materials to use in connection with this renovation.

10

53.     While the Conroys push forward the renovation of the entry foyer, the already approved renovation of the front stairs and second floor foyer leading to units 2 and 3 remains neglected.

54.     The Cheslers and Frank Ansel each funded an additional $4,000 toward the completion of the project to renovate the front stairs and second floor foyer leading to units 2 and 3.   The Conroys refused and continue to refuse to contribute any funds to this improvement to the Condo Property common areas.

55.     Frank Ansel ultimately demanded a much more extensive renovation than was permitted by the limited funding available as a consequence of the Conroys' refusal to fund any portion of the special assessment necessary to complete the second floor foyer renovation.

56.     Although the second floor foyer of the Condo Property is a very small space – approximately 3 ½' x 5' in size – Frank purchased an excessively expensive $2000 chandelier and framed photography for the foyer without consulting with the Cheslers.

57.     The Cheslers balked at contributing even more funds for such extravagant expenditures for such a small area, and the second floor foyer renovation stalled for more than two years, leaving unsightly and dangerous open wiring protruding from the walls in violation of local codes and ordinances.

58.     On behalf of the Association, the Cheslers hired an electrician to cap the open wall sockets and wiring in order to make the area safe and to comply with local codes and ordinances, but the Conroys and Frank refused to authorize the Association's payment of the electrician's fee to perform this work, requiring the Cheslers to pay for the same out of their own funds.

59.     In the late 2007, Frank decided to place his unit for sale, and installed the expensive chandelier and painting that he had purchased in the second floor foyer in order to inflate the perceived value of the Condo Property and obtain a higher price for his unit.

60.     Frank still claims ownership of these fixtures installed in the common area, however, and stated that he plans to take these fixtures with him when he sells his unit, leaving the renovation of the second story foyer unfinished even after taking the Cheslers' funds for the renovation.

61.     Even while expending extraordinary amounts on unnecessarily expensive renovations and improvements of personal interest to them, but not vital to the maintenance of the Condo Property, the Conroys and Frank Ansel failed and refused to properly maintain other common elements of the Condo Property that are necessary and vital for the Cheslers' use and enjoyment of their condominium.

62.     The Cheslers are an elderly couple living on the third floor of a three story walkup condominium building.  Consequently, the intercom system of the building is a critical common element, vital to the Cheslers' use and enjoyment of their property.

63.     The intercom system malfunctioned in or around October, 2006.  The Cheslers currently get nothing but white static through their intercom system.  Guests and other visitors, including postal and other delivery company personnel, are unable to reach the Cheslers on the intercom system.

64.     As a short-term solution, the Cheslers' have posted notes on their intercom at the building entrance advising visitors that their intercom does not work, and requesting that visitors call the Cheslers on their home phone or cell phones.

65.     This interim solution is very problematic for the Cheslers, as it does not allow the Cheslers to "buzz" visitors into the building from their third floor unit.  Instead, Larry Chesler (now 71 years old) or Jackie Chesler (now 66 years old) must walk down and then back up three flights of stairs to allow visitors entry to the building.

66.     The Cheslers repeatedly have demanded that the malfunctioning intercom system be repaired, but the Conroys and Frank have refused to authorize the Association to repair this critical common element of the Condo Property.

67.     When the Cheslers contacted the maintenance company for the intercom system directly to ask the company to investigate why the system was not working, the Conroys and Frank refused to authorize the Association's payment of the $138.15 invoice from the maintenance company, requiring the Cheslers to pay for the same out of their own funds.

68.     Making the situation even more intolerable, the Conroys (who dislike having any notes posted in the common areas of the building) keep removing the notes the Cheslers place on their intercom to inform their guests, visitors and delivery persons that their intercom does not function properly.  On one recent Saturday, the Conroy's removed the Cheslers' notes on at least three occasions immediately after the Cheslers reposted a new note.

69.     The Cheslers have complained about this harassment to the Conroy/Ansel-Controlled Board, and repeatedly have demanded repair of the intercom system or other reasonable accommodation to the Cheslers, but their complaints have been ignored and the harassment continues, despite the fact that all the other unit owners and the Conroy/Ansel-Controlled Board were well aware of the ages of both of the Cheslers, of Larry Chesler's continuing physical disability, and the substantial physical hardship such harassment caused the Cheslers on a daily basis.

70.     The rooftop gutters to the Condo building also require repair, which repairs have been neglected by the Conroys and Frank Ansel, resulting in damage to the Cheslers' home.

71.     Repairs to the rooftop gutters and damages caused by neglect of these gutters are the responsibility of the Association.

72.     Over the past several years, the gutters have experienced ice accumulation, known as "ice-damming," in cold weather, which has caused ice to be forced back onto the rooftop and upper wall of the building.

73.     The ice damming problem has been noted in Association board meetings (before Richard Conroy became president and stopped having board meetings), and the Cheslers – who are most at risk of damage from the ice-damming because they live on the top floor of the building – repeatedly have requested that the gutters be repaired.

74.     The Conroys and Frank Ansel decided, over the objection of the Cheslers, to delay the gutter repairs in favor of less necessary renovations and improvements, including expensive and unnecessary landscaping of the small front yard of the Condo Property.

75.     The foregoing neglect of the gutter repairs caused substantial damage to the Cheslers, when the ice-damming resulted in such damage to the roof and upper wall that water poured into the Cheslers' ceiling and walls, destroying a valuable painting and expensive draperies and warping the unit's hardwood floors.

76.     Upon information and belief, the foregoing acts of harassment and intimidation were intended by the Conroys to force the elderly Cheslers to sell and move away from their home.  Frank Ansel and the Conroy/Ansel-Controlled Board knowingly allowed the Conroys to create and perpetuate this hostile housing environment.

**COUNT I – VIOLATION OF FAIR HOUSING ACT (42 USCA 3601 *et seq.*)**
**(By the Cheslers against 1327 Dearborn Condominium Association,**
**Richard Conroy, Ana Conroy and Francis Ansel)**

77.    Plaintiffs Larry and Jackie Chesler restate the allegations set forth in Paragraphs 1 through 76 as if fully restated herein.

78.    In May 2006, at the age of 69, Larry underwent spinal surgery requiring that he be placed in a brace for 23 of 24 hours each day and rendering him almost completely immobile.

79.    While not currently confined to the brace, Larry continues to be limited in mobility and for all intents and purposes under the Fair Housing Act (hereafter referred to as the "FHA"), Larry is regarded as being handicapped.

80.    Larry was issued a handicapped parking permit because of his condition and the City of Chicago designated a handicap parking spot in front of 1327 N. Dearborn Parkway, Chicago, Illinois 60610, specific to Larry.

81.    As a result of the surgery, Larry suffers from a physical impairment which substantially limits one or more of his major life activities. 42 USCA § 3602(h)(1).

82.    As a result of the surgery, Larry is regarded as having a physical impairment. 42 USCA § 3602(h)(3).

83.    Larry was issued a permanent handicap parking pass by the City of Chicago.

84.    Since June 2006, the Association, Richard Conroy, Frank Ansel and Ana Conroy, have failed and continue to fail to make reasonable accommodations to the property so that Larry may continue to use and enjoy the premises.

85.    In June 2006, Jackie informed Frank and the Conroys that her husband would have difficulty moving because of his condition and asked them to help maintain a clean and dry

environment in the common areas so that her husband could move in safety through the Condo Property walkways and stairwells.

86.    Despite these requests, the Conroys, Frank and the Association have failed to maintain a clean and dry environment. On the contrary, Ana Conroy, with the Association's knowledge even after repeated complaints from the Cheslers, repeatedly has hosed down the steps and walkway leading up to the building's front entrance, knowing that this creates a hazard for Larry in his impaired physical condition.

87.    Ana Conroy continues this practice despite repeated communications from the Cheslers about the hazard this creates, both for Larry and for visitors to the Condo Property.

88.    Ana Conroy, with the Association's knowledge, repeatedly has removed the dry mats located at the building's front entrance, adding to the hazard for Larry in his impaired physical condition.

89.    The Cheslers have made numerous requests to the Conroys, Frank Ansel and the Association to prevent or stop Ms. Conroy from creating further hazards, thereby endangering Larry in his impaired physical condition. The Conroys, Frank Ansel and the Association failed and refused to prevent Ms. Conroy from creating such hazards, thereby refusing to accommodate Larry and further endangering him in his impaired physical condition.

90.    Additionally, the Cheslers have requested that the Conroys, Frank Ansel and the Association work with the Cheslers to monitor and remedy dangerous ice buildup and poor lighting conditions in the back stairwell.  The buildup of ice and poor lighting are especially dangerous to Larry, given his impaired physical condition.

91.     The Conroys, Frank Ansel and the Association refused and continue to fail to address and remedy the hazards created by snow and ice buildup at the back stairwell of the property and the poor lighting in the back stairwell.

92.     The Cheslers also have demanded that the Conroys, Frank Ansel and the Association repair the defective building intercom system, so that the Cheslers' door buzzer and intercom function properly. Because the door buzzer and intercom system are not functioning properly, Larry Chesler is forced to go down three flights of stairs in order to open the door for visitors and to accept delivery of packages or other items (food deliveries, etc.).

93.     The Conroys, Frank Ansel and the Association failed and refused to repair the intercom system. On the contrary, when the Cheslers engaged a service provided to evaluate the intercom system defects and recommend a solution, the Conroys refused to allow access into their unit to permit the repairman to access the rear of the intercom system, which shares a common wall with the Conroy's unit. The Conroys and Frank Ansel also refused to authorize the Association's payment of the repairman's invoice.

94.     The Cheslers have requested that the Conroys, Frank Ansel and the Association work with the Cheslers to provide sufficient lighting in the common stairwells, including the dark back stairwell in which the third floor lights have been out for more than a year, so that Larry, in his impaired physical condition, can ascend and descend the stairs more safely and easily.

95.     The Conroys, Frank Ansel and the Association refused to address the lighting deficiencies in the common stairwells, thereby increasing the hazard to Larry in his impaired physical condition.

96.     The Cheslers repeatedly have requested that the Conroys, Frank Ansel and the Association work with the Cheslers to ensure that the Condo Property sidewalk to and from Larry's reserved handicap parking spot in the front of the building be kept clear, especially in winter and in times of accumulating snow.

97.     The Conroys, Frank Ansel and the Association have refused to keep the walkway clear. On the contrary, during periods of snowfall, the Conroys have directed the Association's snow removal service providers to push the snow accumulation up to Larry's handicap parking spot, intentionally making it more difficult for Larry to access the building in his impaired physical condition.

98.     The Cheslers repeatedly have requested that the Conroys, Frank Ansel and the Association work with the Cheslers to ensure that the Condo Property walkway from the back stairwell to the Chesler's assigned parking spots be kept clear.

99.     The Conroys, Frank Ansel and the Association have refused to keep the rear walkway clear. On the contrary, both the Conroys and Frank Ansel repeatedly have relocated the Association's trash canisters in the Cheslers' parking spot in the rear of the building, despite the fact that such placement blocks access to the Condo Property utility meters, intentionally making it more difficult for Larry to access the building from the Chesler's rear parking spot and further endangering Larry when he is forced to move the garbage canisters.

100.     42 USCA § 3604(f)(3)(B) states that it is a violation of the Fair Housing Act to refuse "to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling."

101.     Each of the Cheslers' requests for accommodations have been reasonable.

102.    Through the acts stated herein this Count, Richard Conroy, Frank Ansel and the Conroy/Ansel-Controlled Board have violated the Fair Housing Act by refusing and continuing to refuse to make reasonable accommodation in the practices and services of the Association in order to afford Larry equal opportunity to use and enjoy the property and common elements.

WHEREFORE, Larry and Jackie Chesler respectfully request that this Court find in their favor and against 1327 Dearborn Condominium Association, Richard Conroy, Ana Conroy and Francis Ansel, and for the following relief:

(a) Declaratory Judgment directing Defendants to remedy the conditions requested by Plaintiffs and described in detail herein, including but not limited to the repair of the intercom and door buzzer system, and the upkeep and maintenance of the stairwells, walkways and other common areas so that Larry Chesler may use and enjoy the building's common elements;

(b) An order enjoining the Association, Richard Conroy, Ana Conroy and Francis Ansel from hosing down the Condo Building stairways and walkways when Larry Chesler may require access to such stairways and walkways, from removing the safety mats and salt canisters from the front and back entrances to the property, from placing the Association trash containers in front of the building utility meters or in any other manner restricting Larry Chesler's access to the Cheslers' parking space at the back of the Condo Property, from blocking Larry Chesler's access to his handicapped parking spot with snow, ice or any other impediment, requiring that all portions of the Condo Property stairwells remain well-lit and unobstructed, and otherwise requiring the maintenance of the Condo Property in a manner necessary for the safe use and enjoyment of the property by Larry Chesler;

(c) Punitive Damages in an amount to be determined at Trial;

(d) Compensatory damages in an amount to be determined at Trial;

(e) Costs and attorneys fees per 42 USCA § 3613(3)(c)(2);

(f) Cost of suit; and

(g) Any other relief that this Court deems just and necessary.

**COUNT II – HOSTILE HOUSING ENVIRONMENT**
**(By the Cheslers against the 1327 Dearborn Condominium Association,**
**Richard Conroy, Ana Conroy and Frank Ansel)**

103.    Plaintiffs Larry and Jackie Chesler restate the allegations set forth in Paragraphs 1 through 76, as if fully restated herein.

104.    Through their actions described above and herein, the Conroys, Frank Ansel and the Association repeatedly and systematically harassed, insulted and otherwise tormented the Cheslers at their place of residence and in the surrounding common elements, and haved continued this pattern of harassment despite repeated objections by the Cheslers.

105.    Through their action and inaction described herein, the Association, Richard, Ana and Frank created, fostered and ratified a hostile housing environment at 1327 N. Dearborn Parkway.

106.    The subject harassment was designed to interfere and has successfully interfered with the Cheslers' fair and equal use and enjoyment of their home and the Condo Property common areas.

WHEREFORE, Plaintiffs Larry Chesler and Jackie Chesler respectfully request that this Court grant judgment in their favor and against the 1327 Dearborn Condominium Association, Richard Conroy, Ana Conroy and Frank Ansel and to award the following relief:

(a) Punitive and exemplary damages in an amount to be proven at trial;

(b) Compensatory damages in an amount to be proven at Trial;

(c) Injunctive relief precluding the Defendants from continuing the harassment of the Cheslers;

(d) Punitive and exemplary damages in an amount to be proven at trial;

(e) Cost of suit; and

(f) Any other relief that this Court deems just and necessary.

## COUNT III –INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (By the Cheslers Against Ana Conroy)

107.    Plaintiffs Larry and Jackie Chesler restate the allegations set forth in Paragraphs 1 through 76 as if fully restated herein.

108.    As set forth above and herein, in May 2006, at the age of 69, Larry underwent major spinal surgery (the fusion of 5 vertebrae), requiring that he be placed in a brace for 23 of 24 hours each day for three months and rendering him almost completely immobile.

109.    Jackie informed Frank and the Conroys that her husband would have difficulty moving because of his condition and asked them to help maintain a clean and dry environment in the common areas so that her husband could move safely throughout the Condo Property walkways and stairwells.

110.    Rather than comply with this request, Ana Conroy took this opportunity to make it even more difficult for Larry Chesler to maneuver through the common areas.  Among other actions, Ana hosed down the front steps at least twice daily, over the repeated objections of the Cheslers. She would then remove the safety mat that Jackie placed over the wet steps as Jackie went to assist her disabled husband to and from his handicapped parking spot in front of the building.

21

111.    In July 2006, when the temperature was in the 90's and while Larry was still required to wear his immobilizing brace for 23 hours each day, Ana Conroy complained that Frank Ansel's air conditioner was leaking condensation, and threatened to have the electricity for the entire building turned off unless Jackie gave the Conroys the keys to Mr. Ansel's unit (which she did not have).

112.    When Jackie objected to Ana Conroy that such an action would cause the Cheslers undue hardship because Larry was home sick and immobilized, Ana responded that Jackie would just have to move Larry somewhere else.

113.    Ana Conroy knew or should have known that turning off the electricity and thereby shutting off the air conditioning to the building would harm Larry Chesler, who was immobilized and under doctor supervision in the Cheslers' home.

114.    Ana Conroy knew or should have known that her threat to turn off all the building's electricity (in the middle of the summer) while Larry Chesler was immobilized and under doctor supervision in the Cheslers' home, would cause both Larry and Jackie Chesler severe emotional distress.

115.    In the circumstances that existed at the time, Ana Conroy's threat to turn off the building's electricity was extreme and outrageous, and would be considered extreme and outrageous to a reasonable person.

116.    For several weeks, the Cheslers lived in fear that their power would be cut at any moment while Larry was incapacitated on the third floor.

117.    As a result of Ana's threats and threatening behavior, Jackie became extremely anxious and was forced to obtain psychiatric help.

118.    Jackie's stress and anxiety from Ana's threats and threatening behavior became even more pronounced after Ana's November 2006 assault and battery upon Jackie in September 2006.

119.    Jackie's stress as a result of Ana Conroy's threats and threatening behavior became so pronounced that her physicians advised Jackie to move out of the condominium for an extended period of time to avoid contact with Ana Conroy to alleviate the stress and anxiety. Jackie followed the advice of her physician and rented a home for 2 months in Massachusetts and for one month in California, at a great cost and inconvenience to the Cheslers.

WHEREFORE, Plaintiffs Larry Chesler and Jackie Chesler respectfully request that this Court grant judgment in their favor and against Ana Conroy and to award the following relief:

(a) Compensatory damages in an amount to be proven at trial;

(b) Punitive and exemplary damages in an amount to be proven at trial;

(c) Cost of suit; and

(d) Any other relief that this Court deems just and necessary.

## COUNT IV – ASSAULT AND BATTERY
### (By Jackie Chesler against Ana Conroy)

120.    Plaintiff Jackie Chesler restates the allegations set forth in Paragraphs 1 through 71 as if fully restated herein.

121.    On September 06, 2006, Jackie and Larry returned home with their daughter and grandchildren (who were visiting from Massachusetts) to find Ana Conroy installing new decorative lighting in the common area front yard of the Condo Property.

122.    The new lighting purchased by Ana had not been submitted to or approved by the Association, nor were they authorized under the annual budget or in any special assessment.

23

123.   Jackie explained to Ana that she was not permitted make such changes to the common areas or expend Association funds without prior approval of the Association and the other unit owners, and attempted to move the lights into the Condo Property storage area until the issue could be addressed by the Association.

124.   Ana became enraged, began wildly gesticulating and swearing, and then assaulted Jackie, forcibly and violently grabbing and twisting Jackie's arm, causing Jackie severe pain and bruising.

125.   At the time of the assault, Jackie was 64 years old and Ana was 35 years old.

126.   Ana's foregoing acts of assault and battery were committed with deliberate violence and oppression against an elderly woman almost thirty years her senior.

127.   As a direct and proximate consequence of this assault and battery, Jackie suffered both physical and mental damages, has sought both medical and psychiatric treatment and has suffered from elevated blood pressure (hypertension) ever since the battery.

128.   Along with severe bruising, Jackie's physician diagnosed Jackie with having post-traumatic stress as a result of Ana's assault and battery upon her.

129.   In order to relieve the stress caused by the assault, Jackie's physician prescribed anti-anxiety medication and advised Jackie to avoid contact with Ana Conroy for an extended period of time, requiring Jackie to stay away from her own home from November 2006 to January 15, 2007.  During that time, Jackie was forced first to stay in hotels and then traveled to stay near family members in Scituate, Massachusetts, where the Cheslers rented a home for $2500 per month.

130.    Jackie incurred several thousand dollars in medical bills and thousands of dollars in travel and temporary housing expenses as a direct and proximate consequence of Ana Conroy's assault and battery upon her.

131.    Jackie's medical bills directly and proximately arising out of Ana's assault and battery upon her are in excess of $14,000.

132.    Jackie's travel expenses directly and proximately arising out of Ana's assault and battery upon her are in excess of $7,000.

WHEREFORE, Plaintiff Jackie Chesler respectfully requests that this Court grant judgment in her favor and against Ana Conroy and to award the following relief:

(a) Compensatory damages in an amount to be proven at trial;

(b) Punitive and exemplary damages in an amount to be proven at trial;

(c) Cost of suit; and

(d) Any other relief that this Court deems just and necessary.

**COUNT V – NEGLIGENCE – BACK STAIRWELL**
**(By the Cheslers against 1327 Dearborn Condominium**
**Association and Ana Conroy, individually)**

133.    Plaintiffs Larry and Jackie Chesler restate the allegations set forth in Paragraphs 1 through 76 as if fully restated herein.

134.    Pursuant to the Condominium Declaration, the Board of Managers is responsible for the operation, care, upkeep and maintenance of the buildings common elements.

135.    The Condominium Declaration also states that the stairwells, including the back entrance and stairwell, are amongst the common elements shared by the buildings' unit owners.

136.    On multiple occasions between December 2005 and January 2007, the Cheslers, informed the Conroy/Ansel-Controlled Board that ice build up at the front and back entrances to the Condo Property posed a hazard to the unit owners and guests of the unit owners.

137.    The Cheslers requested that the Association take affirmative steps to alleviate the danger associated with the hazard, including placement of salt containers at both the front and back entrances to the building.

138.    The Cheslers placed a salt receptacle at the base of the steps at each of the entrances to the building, in order to throw salt on the ground when ice began to accumulate at the front and back entrances.

139.    Ana Conroy, who apparently disliked the "look" of the salt containers, repeatedly removed the salt canisters from the building entrances, ultimately hiding the salt containers from the Cheslers so the Cheslers could not replace them at the entrances.

140.    Through the Cheslers' repeated complaints, Richard Conroy, Frank Ansel and the Conroy/Ansel-Controlled Board were fully aware of Ana Conroy's actions in removing and hiding the salt canisters, but Richard Conroy, Frank Ansel and the Conroy/Ansel-Controlled Board refused to remedy the situation.

141.    Ana Conroy purposefully and negligently created a hazard by removing and hiding the salt necessary to prevent the buildup of snow and ice at the building entrances.

142.    Richard Conroy, Frank Ansel and the Conroy/Ansel-Controlled Board negligently allowed the hazard to remain despite the Cheslers' repeated verbal and written warnings and demands that the salt containers be replaced.

143.    On February 14, 2007, Jackie Chesler slipped on the ice accumulated on the back entrance and back stairwell, severely injuring her back.

26

144.    The Conroys, Frank Ansel and the Conroy/Ansel-Controlled Board knew or should have known of the dangers posed by the accumulation of ice in, on and around the back walkway and entrance.

145.    The acts and omissions of the Conroys, Frank Ansel and the Association constitute negligence.

146.    Jackie Chesler was injured as a result of this negligence.

147.    Jackie's injuries required rehabilitation and the Cheslers incurred substantial medical bills stemming from the injuries sustained in the fall.

WHEREFORE, Plaintiffs Larry and Jackie Chesler respectfully request that this Court grant judgment in their favor, and for the following relief:

(a) Compensatory damages in an amount to be proven at trial;

(b) Cost of suit; and

(c) Any other relief that this Court deems just and necessary.

**COUNT VI – NEGLIGENCE – ICE DAMMING IN GUTTERS**
**(By the Cheslers against the 1327 Dearborn Condominium Association)**

148.    Plaintiffs Larry and Jackie Chesler restate the allegations set forth in Paragraphs 1 through 76 as if fully restated herein.

149.    Pursuant to the Condominium Declaration, the Board of Managers is responsible for the operation, care, upkeep and maintenance of the buildings common elements.

150.    The Condominium Declaration states that the gutters are amongst the common elements shared by the buildings' unit owners.

151.    In the past, the gutters of the Condo Property have experienced ice accumulation, known as "ice-damming," in cold weather, which has caused ice to be forced back onto the rooftop and upper wall of the building.

152.    Upon information and belief, ice accumulation in the building gutters caused damage to the building and unit 3 in 2001 (before the Cheslers purchased unit 3) and a claim for the damage was submitted by the Association to the Association's insurance carrier.

153.    The Cheslers – who are most at risk of damage from the ice-damming because they live on the top floor of the building – repeatedly have requested that the gutters be repaired.

154.    The Cheslers requested that the Conroy/Ansel-Controlled Board take affirmative steps to address the ice accumulation and subsequent buildup in the gutters.

155.    Despite acknowledging the problem and need for a remedy, the Conroy/Ansel-Controlled Board took no action to remedy the problems with the ice accumulation in the building gutters.

156.    The necessary repairs to the gutters were put off because the Conroys demanded that the Association's funds be expended upon cosmetic improvements to the first floor foyer and the Condo Association's tiny front yard.

157.    The Conroys and Frank Ansel decided, over the objection of the Cheslers, to delay the gutter repairs in favor of less necessary renovations and improvements, including expensive and unnecessary landscaping of the small front yard of the Condo Property.

158.    The foregoing neglect of the gutter repairs caused substantial damage to the Cheslers, when the ice-damming resulted in such damage to the roof and upper wall that water poured into the Cheslers' ceiling and walls, destroying a valuable painting, furniture and expensive draperies and warping the unit's hardwood floors.

159.    The total amount of damages suffered by the Cheslers as a result of the damage caused by the ice damming is in excess of $12,000.

160.    The Association's failure to timely remedy the known problems with the gutters constitutes negligence.

161.    The Cheslers have been injured as a result of the Association's negligence.

162.    But for the Association's negligence, the damage in the Cheslers' unit could have been avoided.

WHEREFORE, Plaintiffs Larry and Jackie Chesler respectfully request that this Court grant judgment in their favor, and for the following award:

(a)  Compensatory damages in an amount to be proven at trial;

(b)  Cost of suit; and

(c)  Any other relief that this Court deems just and necessary.

## COUNT VII – BREACH OF FIDUCIARY DUTY – ASSOCIATION GOVERNANCE
### (By the Cheslers against Richard Conroy and Frank Ansel)

163.    Plaintiffs Larry and Jackie Chesler restate the allegations set forth in Paragraphs 1 through 76 and 133 through 162 as if fully restated herein.

164.    As set forth above, in January 2006, Richard Conroy was elected president of the Association, Frank Ansel was elected Treasurer of the Association and Jackie Chesler was elected Secretary of the Association.

165.    From January 2006 forward, Richard Conroy and Frank Ansel effectively have excluded the Cheslers from the business and operations of the Association.

166.    Despite accepting appointment as the Association's Treasurer, Frank Ansel abdicated responsibility for the Association accounts and gave the Association checkbook to Richard Conroy.

167.    Despite repeated objections and complaints by the Cheslers, Richard Conroy still retains exclusive custody and control of the Association checkbook to this day, and has failed to

respond to the Chesler's many demands that he give them access to the Association accounts and relinquish his exclusive control of the Association checkbook.

168.     Since January 2006, Richard Conroy and Frank Ansel purported to conduct the business and would expend the funds of the Association based upon telephone calls, emails and notes they exchanged, without holding any formal or noticed Association board meetings.

169.     The Cheslers repeatedly objected to the manner in which Richard Conroy and Frank Ansel were purporting to conduct the business of the Conroy/Ansel-Controlled Board, and to the fact that Richard Conroy failed and refused to call any Association board meetings for a period of two years.

170.     Pursuant to the Association's Declaration and By-laws, Richard Conroy's term as President of the Association and Frank Ansel's term as Treasurer of the Association expired at the end of December 2006.

171.     Although required to do so under the Association's Declaration and By-laws, Richard Conroy failed and refused to call a meeting of unit owners in November 2006, as continued to hold himself out as the President of the Association and to control the checkbook of the Association throughout 2007, despite repeated objections from the Cheslers.

172.     Without proper any proper notice or meeting of the unit owners, Richard Conroy and Frank Ansel met in October or November 2007, and decided that Frank Ansel would hold himself out as President of the Association and Richard Conroy would hold himself out as Treasurer of the Association beginning January 2008.

173.     Despite repeated objections from the Cheslers, no proper meeting of the Association Board has been held to elect Association officers for 2008.

174.    Frank Ansel nonetheless has held himself out as President of the Association in 2008, and has directed the Association's vendors, such as the Association's insurer, to disregard communications from the Cheslers.

175.    Richard Conroy similarly has held himself out as the Association's treasurer, and has continued to retain exclusive control over the Association checkbook and to write checks on the Association accounts without authority and without any oversight.

176.    Despite their obligations under the Association Declaration and By-laws, Richard Conroy and Frank Ansel have:

(a) Failed to call regular board meetings or annual unit owner meetings as required by the Condominium Declaration;

(b) Failed to properly maintain and upkeep the common areas, including hallways, first floor common area and the building's gutters;

(c) Failed to make books and records available to requesting unit owner;

(d) Failed to give notice of their meetings to the Cheslers and failed to provide minutes of their meetings to the Cheslers;

(e) Failed to properly prepare and obtain unit owner and board approval of an annual budget for the Association for 2007 and 2008;

(f) Failed to properly maintain a reserve;

(g) Failed to give proper notice and/or make claims to condominium's insurance company.

177.    The Conroy/Ansel-Controlled Board has failed and continues to fail to represent the interests of all the unit owners.

178.    The Conroy/Ansel-Controlled Board has expended Association funds without first authorization in an approved budget or through an approved special assessment, as mandated by the Association's Declaration and By-laws.

179.    The Conroy/Ansel-Controlled Board has misapplied the assessments paid by the Unit Owners, including the Cheslers, such that there was not enough money to pay all bills due for the month of January, 2008, and such that the Association has no reserves.

180.    The Conroy/Ansel-Controlled Board has failed and refused to collect money from the Conroys relating to previously agreed upon amounts for the renovation and maintenance of the front stairway and the second floor landing.

181.    The Conroy/Ansel-Controlled Board has wasted and continues to waste the Association's funds without following the proper procedures dictated by the Association's Declaration and By-laws.

182.    The Conroys, Frank Ansel and the Association ignored repeated requests by the Cheslers to repair and maintain critical common elements of the Condo Property, including the intercom system and the gutters.

183.    Through the foregoing acts and omissions, Richard Conroy and Frank Ansel breached their fiduciary duty owed to all unit owners of 1327 N. Dearborn Condominiums.

184.    Richard Conroy and Frank Ansel put their own personal interests before the interests of Association, thereby breaching their fiduciary duties to the Condominium Association.

185.    Larry and Jackie Chesler have been damaged by the breaches of fiduciary duty by Richard Conroy and Frank Ansel.

WHEREFORE, Plaintiffs Larry and Jackie Chesler respectfully request that this Court grant judgment in their favor, and for the following relief:

a.) Order a full accounting of the Association's receipts and expenditures and requiring Defendants Richard Conroy and Frank Ansel to refund to the Association unauthorized expenditures;

b.) Order Richard Conroy to relinquish control of the Association checkbook, and that all future Association disbursements require the signatures of the owners of two separate units;

c.) Order Richard Conroy to call and hold the proper Unit Owners and Association Board Meetings so that a proper board may be elected per the Declaration;

d.) Order that the Association repair and maintain the common elements of the condo property, including the gutters, stairways and intercom system;

e.) Order that the Association collect monies due and owing by Richard and Ana Conroy relating to the common area front stairway and second floor landing;

f.) Punitive damages in an amount to be determined at Trial;

g.) Attorneys fees per 765 ILCS 605/19;

h.) Cost of suit; and

i.) Any other relief that this Court deems just and necessary.

### COUNT VIII – VIOLATION OF THE CONDOMINIUM PROPERTY ACT
### (By the Cheslers against Richard Conroy, Ana Conroy, Frank Ansel & the 1327 Dearborn Condominium Association)

186.    Plaintiffs Larry and Jackie Chesler restate the allegations set forth in Paragraphs 1 through 76 and 164 through 184 as if fully restated herein.

187.    Section 18.4 of the Illinois Condominium Property Act states that the Board of Managers will provide for the operation, care, upkeep, maintenance, replacement and improvement of the common elements.

188.    Pursuant to the Declaration, the back entrance, stairway and the gutters of 1327 N. Dearborn are common elements to be maintained by the Association.

189.    The Conroy/Ansel-Controlled Board, Richard Conroy and Frank Ansel in their capacities as board members failed to provide for the operation, care, upkeep, maintenance, replacement and improvement of the back entrance, stairways and the building's gutters.

190.    The failure to provide for the care, upkeep and maintenance of the back entrance, stairways and the building's gutters resulted in Jackie Chesler's slip and fall as well as the ice-damming and subsequent damage to the Cheslers' Condominium as a result of the ice damming.

191.    The Board's failure to adequately respond to and remedy the issues with the back stairwell and the gutters is a violation of the Illinois Condominium Property Act.

192.    Larry Chesler has requested – verbally and in writing - on several occasions to review the books and records maintained by the Association.

193.    The Board, particularly Frank Ansel, has failed and continues to fail to make the Association's books and records available for inspection.

194.    The Association's failure and refusal to make its books and records available to Larry Chesler is a violation of 765 ILCS 605/19 of the Illinois Condominium Property Act.

195.    The Illinois Condominium Property Act also obligates the Association to enforce and collect funds relating to the renovation and/or maintenance of the property's common elements.

196.    The Conroys have continued to refuse to contribute any money towards the renovation of the common area front stairway and Second floor landing, despite being obligated to do so.

197.    As stated, this special assessment was approved in 2004, and, upon information and belief, was disclosed to the Conroys during the purchase of their condo unit.

198.    The Conroys failure and refusal to pay this special assessment is a violation of the Illinois Condominium Property Act.

199.    The Conroy/Ansel-Controlled Board failure to require or to collect assessments from the Conroys relating to the renovation of the common area front stairway and the second floor landing is a violation of the Illinois Condominium Property Act.

WHEREFORE, Plaintiffs Larry and Jackie Chesler respectfully request that this Court grant judgment in their favor, and for the following award:

a.) Order a full accounting of the Association's receipts and expenditures and requiring Defendants Richard Conroy and Frank Ansel to refund to the Association unauthorized expenditures;

b.) Order Richard Conroy to relinquish control of the Association checkbook, and that all future Association disbursements require the signatures of the owners of two separate units;

c.) Order Richard and Ana Conroy to contribute funds towards the special assessment for the front stairway and landing leading to Units 2 and 3;

d.) Attorneys fees per 765 ILCS 605/19;

e.) Cost of suit; and

f.) Any other relief that this Court deems just and necessary.

DATE: May 09, 2008                          LAWRENCE CHESLER and
                                            JACQUELINE CHESLER, Plaintiffs,


                                            /s/ Troy M. Sphar_____
                                            By one of their Attorneys


Thomas G. Griffin (ARDC # 6202401)
Troy M.  Sphar (ARDC # 6278497)
GRIFFIN LAW OFFICES, LLC
656 West Randolph Street, Suite 500W
Chicago, Illinois 60661
(312) 648-1700

```
08CV 2679 NF
JUDGE KENDALL
MAGISTRATE JUDGE COLE
```

# EXHIBIT A

DECLARATION OF CONDOMINIUM OWNERSHIP

AND BY-LAWS

EASEMENTS, RESTRICTIONS AND COVENANTS

OF

1327 DEARBORN CONDOMINIUM

THIS DECLARATION made and entered into by
BANK OF RAVENSWOOD                          as Trustee under Trust Agreement
dated  June 20, 1978          and known as Trust No. 25-3392 and not individually, for
convenience hereinafter referred to as the "Trustee":

WITNESSETH THAT:

WHEREAS, the Trustee is the legal title holder of the following described
real estate in the  City  of      Chicago     County of Cook     and State of Illinois:

> Lot 8 (except the South 98/100 of a foot thereof
> and except that part falling in Greifenhagen's
> Subdivision) in the Subdivision of Lot 6 in Bronson's
> Addition to Chicago, in  Section 4, Township 39 North,
> Range 14 East of the Third Principal Meridian, in
> Cook County, Illinois.

WHEREAS, it is the desire and intention of the Trustee to enable the Propert
(as hereinafter defined) which includes, but is not limited to, said real estate
together with the building, structure, improvements and other permanent fixtures of
whatsoever kind now or hereafter thereon, and all rights and privileges belonging or
in anyways pertaining thereto to be owned by Trustee and by each successor in
interest of Trustee, under that certain type or method of ownership commonly known
as "Condominium", and to submit the Property to the provisions to the Condominium
Property Act of the State of Illinois, as amended from time to time; and

WHEREAS, the  Trustee, acting under direction of the parties authorized
to direct the Trustee, has elected by this Declaration to establish, for the benefit
of such Trustee and for the mutual benefit of all future Unit Owners or occupants
of the Property, or any part thereof, which shall be known as

1327 DEARBORN CONDOMINIUM

-1-

or such other name as may be subsequently adopted pursuant to the Act by the Develop or the Board, certain easements and rights in, over and upon said real estate and certain mutually beneficial restrictions and obligations with respect to the proper use, conduct and maintenance thereof; and

WHEREAS, the Trustee has further elected by this Declaration to declare that the several Unit Owners, occupants, mortgagees and other persons acquiring any interest in the Property shall at all times enjoy the benefits of, and shall at all times hold their interests subject to the rights, easements, privileges and restrictions hereinafter set forth, all of which are declared to be in furtherance of a plan to promote and protect the cooperative aspect of ownership and to facilitate the proper administration of such Property and are established for the purpose of enhancing and perfecting the value, desirability and attractiveness of the Property;

NOW, THEREFORE,    BANK OF RAVENSWOOD

as Trustee aforesaid and not individually, as the legal title holder heretofore described, and for the purposes above set forth, DECLARES AS FOLLOWS:

## ARTICLE I

### DEFINITIONS

For the purpose of brevity and clarity, certain words and terms used in this Declaration are defined as follows:

- (a) "Act" means the "Condominium Property Act", as amended from time to time, of the State of Illinois.

- (b) "Declaration" means the instrument by which the Property is submitted to the provisions of the Act, as hereinafter provided, and such Declaration as from time to time amended.

- (c) "Parcel" means the parcel or tract of real estate land, described in the Declaration, submitted to the provisions of the Act.

- (d) "Property" means all the land, property and space comprising the Parcel, all improvements and structures erected, constructed or contained therein or thereon, including the building and all easements, rights and appurtenances belonging thereto, and all fixtures and equipment intended for the mutual use, benefit or enjoyment of the Unit Owners, submitted to the provisions of this Act.

-2-

(e) "Unit" means a part of the Property designed and intended for any type of independent use.

(f) "Common Elements" means all portions of the Property except the Units, including Limited Common Elements unless otherwise specified.

(g) "Person" means a natural individual, corporation, partner-ship, trustee or other legal entity capable of holding title to real property.

(h) "Unit Owner" means the person or persons whose estates or interests, individually or collectively, aggregate fee simple absolute ownership of a Unit.

(i) "Majority" or "Majority of the Unit Owners" means the owners of more than one-half (1/2) in the aggregate in interest of the undivided ownership of the Common Elements. Any specified percentage of the Unit Owners means such percentage in the aggregate in interest of such undivided ownership.

(j) "Plat" means a Plat or Plats of survey of the Parcel and of all Units in the Property submitted to the provisions of this Act, which may consist of a three-dimensional horizontal and vertical delineation of all such Units.

(k) "Condominium Instruments" means all documents and authorized amendments thereto recorded pursuant to the provisions of the Act, including the Declaration, By-Laws and Plat.

(l) "Common Expenses" means the proposed or actual expenses affecting the Property, including reserves, if any, lawfully assessed by the Board of Managers of the Unit Owner's Association.

(m) "Reserves" means those sums paid by Unit Owners which are separately maintained by the Board of Managers for purposes specified by the Board of Managers or the Condominium Instruments.

(n) "Unit Owners' Association" or "Association" means the Association of all the Unit Owners acting pursuant to By-Laws through its duly elected Board of Managers.

(o) "Purchaser" means any person or persons other than the Developer who purchase a Unit in a bona fide transaction for value.

(p) "Developer" means    DEARBORN PARKWAY CORPORATION,
                                                successors and assigns.

(q) "Limited Common Elements" means a portion of the Common Elements so designated in the Declaration as being reserved for the use of a certain Unit or Units to the exclusion of other Units.

(r) "Building" means all structures, attached or unattached, containing one or more Units.

(s) "Parking Area" means the area provided for parking automobiles as shown or referred to on the Plat.

(t) "Parking Space" means a portion of the Parking Area intended for the parking of a single automobile.

(u)  "Occupant" means a person, or persons, other than a Unit
     Owner, in possession of one or more Units.

(v)  "Voting Members" means the person entitled to exercise
     all voting power in respect to each Unit Ownership.

## ARTICLE II

### UNITS

1. Description. All units located on the Property are delineated
on the Survey, referred hereto as Exhibit "A" and made a part of the Declaration
and are legally described as follows:

UNITS    1, 2, 3, 

as delineated on the Plat of Survey of the following described Parcel of real
estate:

> Lot 8 (except the South 98/100 of a foot thereof
> and except that part falling in Greifenhagen's
> Subdivision) in the Subdivision of Lot 6 in Bronson's
> Addition to Chicago, in  Section 4, Township 39 North,
> Range 14 East of the  Third Principal Meridian, in
> Cook County, Illinois.

which Survey is recorded in the Office of the Recorder of Deeds of Cook County,
Illinois as Document No.

It is understood that each Unit consists of the space enclosed or
bounded by the horizontal and vertical planes set forth and identified as a
Unit in the delineation thereof in Exhibit "A".  The legal description of each
Unit shall consist of the identifying number or symbol of such Unit followed by
the legal description of the Property, as shown on Exhibit "A".  Except as provided
by the Act, no Unit Owner shall, by deed, Plat or otherwise, subdivide or in any
other manner cause the Unit to be separated into any tracts or parcels different
from the whole Unit as shown on Exhibit "A".

2. Certain Structures Not Constituting Part of a Unit.  No structural
components of the Building, and no pipes, wires, conduits, public utility lines,
ducts, flues and shafts situated within a Unit and forming a part of any system
serving one or more other Units, nor the Common Elements shall be deemed part of
said Unit.

## ARTICLE III

### COMMON ELEMENTS

1. Description.  Except as otherwise in this Declaration provided,
the Common Elements shall consist of all portions of the Property except the
Units.  Without limiting the generality of the foregoing the Common Elements shall
include the land, outside walks and driveways, landscaping, stairways, entrances
and exits, halls, lobby, corridors, laundry, elevators and shafts, steam room,
meeting room, basement, roof, structural parts of the Building, component
parts of walls, floors and ceilings and pipes, ducts, flues, shafts and public
utility lines serving the Common Elements or more than one Unit.

-4-

2.  Ownership of Common Elements. Each Unit Owner shall own an undivided interest in the Common Elements as a tenant in common with all the other Unit Owners of the Property, and, except as otherwise limited in the Declaration, shall have the right to use the Common Elements for all purposes incident to the use and occupancy of his Unit as a place of residence, and such other incidental uses permitted by this Declaration, which right shall be appurtenant to and run with his Unit.  Such right shall extend to each Unit Owner, and the agents, servants, tenants, family members and invitees of each Unit Owner.  Each Unit Owner's interest shall be expressed by a percentage amount and, once determined, shall remain constant, and may not be changed without unanimous approval of all Unit Onwers, unless hereafter changed by recorded Amendment to this Declaration consented to in writing by all Unit Owners.  The trustee has so determined each Unit's corresponding percentage of ownership in the Common Elements as set forth in Exhibit "B" attached heteto; and each Unit Owner accepts such determination.

3.  Limited Common Elements. Except as otherwise in this Declaration provided, the Limited Common Elements shall consist of all portions of the Common Elements set aside and allocated for the restricted use of particular Units.  The developer or the owner of Unit 4 may, at his sole expense, erect, use and maintain a roof-top sun deck on the roof of the building, and may construct access to and from his unit through the roof to this sun deck.  Such area shall be deemed a LIMITED COMMON ELEMENT (as defined in the ACT), and shall be for the specific, sole a private use of the said unit owner.  This all may be done without any approval of the Board.  4.  Parking and Storage. The common elements within the structure contain areas for storage of Unit Owners' personal property.  The individual storage areas will be assigned to owners by the Developer at time of occupancy. The parking areas indicated on Page 1 of Exhibit "A" (the Plat) are to be used in common by all of the Unit Owners as from time to time provided by the Board of Managers of the Condominium Association.

5.  Transfer of Limited Common Elements. The use of Limited Common Elements may be transferred between Unit Owners at their expense, provided that the transfer may be made only in accordance with the Condominium Instruments and the Provisions of this Declaration.  Each transfer shall be made by an Amendment to the Declaration executed by all Unit Owners who are parties to the transfer and consented to by all other Unit Owners who have any right to use the Limited Common Elements affected.  The Amendment shall contain a certificate showing that a copy of the Amendment has been delivered to the Board of Managers.  The Amendment shall contain a statement from the parties involved in the transfer which sets forth any changes in the parties' proportionate shares.  If the parties cannot agree upon a reapportionment of their respective shares, the Board of Managers shall decide such reapportionment.  No transfer shall become effective until the Amendement has been recorded.  Rights and obligations in respect to any Limited Common Element shall not be affected, nor shall any transfer of it be effective, unless a transaction is in compliance with the requirements of this Section.

## ARTICLE IV

### GENERAL PROVISIONS AS TO UNITS AND COMMON ELEMENTS

1.  Submission of Property to Provisions of Act. The Property is hereby submitted to the provisions of the Act.

2.  No Severance of Ownership. No Unit Owner shall execute any deed, mortgage, lease or other instrument affecting title to the Unit Ownership without including therein both his interest in the Unit and his corresponding percentage of ownership in the Common Elements, it being the intention hereof to prevent any severance of such combined ownership.  Any such deed, mortgage, lease or other instrument purporting to affect the one without including also the other shall be deemed and taken to include the interest so omitted even though the latter is not expressly mentioned or described therein.

-5-

3. <u>Easements</u>. (a) <u>Encroachments</u>. If any portion of the Common Elements encroaches upon any Unit, or if any Unit encroaches upon any portion of the Common Elements or any other Unit as a result of the construction, repair, reconstruction, settlement or shifting of any building, a valid mutual easement shall exist in favor of the owners of the Common Elements and the respective Unit Owners involved to the extent of the encroachment. A valid easement shall not exist in favor of any Unit Owner who creates an encroachment by his intentional, wilful or negligent conduct or that of his agent.

(b) <u>Utility Easements</u>. The Illinois Bell Telephone Company, Commonwealth Edison Company and all other public utilities serving the Property are hereby granted the right to lay, construct, renew, operate and maintain conduits, cables, pipes, wires, transformers, switching apparatus and other equipment related to their service to the Property, into and through the Common Elements, and the Units, where reasonably necessary for the purpose of providing utility services to the Property.

4. <u>Easements and Rights to Run with Land</u>. All easements and rights described herein are easements and rights running with the land, perpetually in full force and effect, and at all times shall inure to the benefit of and be binding on the Trustee, its successors and assigns, and any Unit Owner, purchaser, mortgagee and other person having an interest in the Property, or any part or portion thereof. Reference in the respective deeds of conveyance, or in any mortgage or trust deed or other evidence of obligation, to the easements and rights described in this Article, or described in any other part of this Declaration shall be sufficient to create and reserve such easements and rights to the respectiv grantees, mortgagees and trustees of such Unit Ownership as fully and completely as though such easements and rights were recited fully and set forth in their entirety in such documents.

## ARTICLE V

### COMMON EXPENSES, MORTGAGES AND REAL ESTATE TAXES

1. <u>Common Expenses</u>. Each Unit Owner shall pay his proportionate share of the common expenses of administration, maintenance and repair of the Common Elements and of any other expenses incurred in conformance with the Declaration and By-Laws or otherwise lawfully agreed upon. Such proportionate share of the common expenses for each Unit Owner shall be in the same ratio as his percentage of ownership in the Common Elements. Payment thereof shall be in such amount and at such times as determined in the manner provided in the By-Laws. If any Unit Owner shall fail or refuse to make any such payment of the common expenses when due, the amount thereof shall constitute a lien on the interest of such Unit Owner in the Property as provided in the Act.

2. <u>Separate Mortgages</u>. Each Unit Owner shall have the right, subject to the provisions herein, to make a separate mortgage or encumbrance on his respect Unit together with his respective ownership interest in the Common Elements. No Unit Owner shall have the right or authority to make or create or cause to be made or created any mortgage or encumbrance or other lien on or affecting the Property or any part thereof, except only to the extent of his Unit and his respective ownership interest in the Common Elements.

3. <u>Separate Real Estate Taxes</u>. It is understood that real estate taxes are to be separately taxed to each Unit Owner for his Unit and his corresponding percentage of ownership in the Common Elements, as provided in the Act. In the event that for any year such taxes are not separately taxed to each Unit Owner, but are taxed on the Property as a whole, then each Unit Owner shall pay his proportionate share thereof in accordance with his respective percentage of ownership interest in the Common Elements.

-6-

## ARTICLE VI

### INSURANCE

1. <u>Fire and Hazard Insurance</u>. The Board of Managers shall acquire as a common expense, a policy or policies of insurance insuring the Common Elements and the Units against loss or damage from fire, lightning and other hazards contained in the customary fire and extended coverage, vandalism and malicious mischief endorsements for the full insurable replacement value of the Common Elements and the Units written in the name of and to require a provision in such policy that the proceeds thereof shall be payable to the members of the Board, as trustees for each of the Unit Owners in the percentages established in Exhibit "B".

All said policies of insurance (1) shall contain standard mortgage clause endorsements in favor of the mortgagee or mortgagees of each Unit, if any, as their respective interest may appear, (2) shall provide that the insurance, as to the interest of the Board, shall not be invalidated by any act or neglect of any Unit Owner, (3) shall provide that notwithstanding any provision thereof which gives the insurer an election to restore damage in lieu of making a cash settlement therefor, such option shall not be exercisable in the event the Unit Owners elect to sell the Property or remove the Property from the provisions of the Act, (4) shall contain an endorsement to the effect that such policy shall not be terminated for nonpayment of premiums without at least ten (10) days' prior written notice to the mortgagee of each Unit, (5) shall contain a clause or endorsement whereby the insurer waives any right to be subrogated to any claim against the Association, its officers, members of the Board, the Trustee, the Developer, the managing agent, if any, their respective employees and agents and the Unit Owners and Occupants, and (6) shall contain a "Replacement Cost Endorsement. The proceeds of such insurance shall be applied by the Board or by the corporate trustee or agent on behalf of the Board for the reconstruction of the Building or shall be otherwise disposed of, in accordance with the provisions of this Declaration and the Act; and the rights of the mortgagee of any Unit under any standard mortgage clause endorsement to such policies shall, notwithstanding anything to the contrary therein contained at all times be subject to the provisions of the Act with respect to the application of insurance proceeds to reconstruction of the Building. The Board may engage the services of and such insurance may be payable to a bank or trust company authorized to do, execute and accept trusts in Illinois to act as Insurance Trustee, or as Agent or Depositary as an alternative to acting as Trustee, and to receive and disburse the insurance proceeds resulting from any loss upon such terms as the Board shall determine consistent with the provisions of this Declaration. The fees of such bank or trust company shall be common expenses.

In the event of any loss in excess of $10,000.00 in the aggregate at the Board's discretion or request of any Unit Owner, the Board shall solicit bids from reputable contractors.

Payment by an insurance company to the Board or to such corporate trustee or agent of the proceeds of any policy, and the receipt of release from the Board or such corporate trustee or agent of the company's liability under such policy, shall constitute a full discharge of such insurance company and such company shall be under no obligation to inquire into the terms of any trust or agency agreement under which proceeds may be held pursuant hereto, or to take notice of any standard mortgage clause endorsement inconsistent with the provisions of the proceeds of any policy by the Board or the corporate trustee.

Each Unit Owner shall inform the Board in writing of additions, alterations or improvements made by said Unit Owner to his Unit and the value thereof which value shall be included in the full replacement insurable cost for insurance purposes. If a Unit Owner fails to inform the Board as provided above and a penalty is assessed in the adjustment of loss settlement, the Unit Owner shall be responsible for such penalty.

-7-

2. Appraisal. The full, insurable replacement cost of the Property, including the Units and Common Elements shall be determined from time to time (but not less frequently than once in any twelve-month period) by the Board.

The Board shall have the authority to obtain an appraisal by a reputable appraisal company as selected by the Board. The cost of such appraisal shall be a common expense.

3. Public Liability and Property Damage Insurance. The Board of Managers shall acquire, as a common expense, and shall have the authority and duty to obtain, comprehensive public liability insurance against claims and liabilities arising in connection with the ownership, existence, use or management of the property in amounts deemed sufficient in the judgment of the Board of Managers, insuring the Board of Managers, the Unit Owners Association, the management agent, and their respective employees, agents, and all persons acting as agents. The Developer shall be included as an additional insured in his capacity as Unit Owner and Board Member. The Unit Owners shall be included as additional insureds but only with respect to the portion of the premises not reserved for their exclusive use. The insurance shall cover claims of one or more insured parties against other insured parties. The insurance shall contain a waiver of any rights to subrogation by the insuring company against any of the above named insured persons.

4. Workmen's Compensation and Other Insurance. The Board of Managers shall acquire, as a common expense, workmen's compensation insurance as may be necessary to comply with applicable laws and such other forms of insurance as the Board, in its judgment, shall elect to obtain, including, but not limited to insurance for the Association, its officers and manager against liability from good faith actions allegedly beyond the scope of their authority.

5. Waiver. Each Unit Owner hereby waives and releases any and all claims which he may have against any other Unit Owner, the Association, its officers, members of the Board, the Declarant, the manager and managing agent of the Building, if any, and their respective employees and agents, for damage to the Common Elements the Units, or to any personal property located in the Units or Common Elements, caused by fire or other casualty, to the extent that such damage is covered by fire or other form of casualty insurance.

6. Notice. The Board of Managers shall notify insured persons concerning the cancellation of insurance obtained pursuant to the terms of this Article.

## ARTICLE VII

## ADMINISTRATION AND OPERATION

1. Administration. The administration of the Property shall be vested in the Board of Managers consisting of the number of persons, and who shall be elected in the manner provided in the By-Laws contained herein, as Articles XIV, XV, XVI, XVII and XVIII. The Developer, after the recording of this Declaration, may cause to be incorporated under the laws of the State of Illinois, a not-for-profit corporation (herein referred to as "the Association") under the name of
1327 DEARBORN CONDOMINIUM ASSOCIATION
or a similar name, which corporation shall be the governing body for all the Unit Owners for the maintenance, repair, replacement, administration and operation of the Common Elements and for such other purposes as are hereinafter provided. The Board of Directors of the Association shall be deemed to be the Board of Managers referred to herein and in the Act. If the Developer does not choose to incorporate a not-for-profit corporation, then the Board of Managers shall cause such in-corporation.

-8-

2. <u>Duties and Powers of the Association</u>. The Unit Owners' Association is responsible for the overall administration of the Property through its duly elected Board of Managers. The duties and powers of the Association and its Board shall be those set forth in its Articles of Incorporation, the By-Laws and this Declaration; provided however that, (i) the terms and provisions of the Act shall control in the event of any inconsistency between the Act, on the one hand, and this Declaration, the Articles of Incorporation and the By-Laws on the other hand, (ii) the terms and provisions of this Declaration shall control in the event of any inconsistency between this Declaration, on the one hand, and the Articles of Incorporation and the By-Laws on the other hand.

3. <u>Indemnity</u>. The members of the Board and the officers thereof or of the Association shall not be liable to the Unit Owners for any mistake of judgment, or any acts or omissions made in good faith as such members or officers on behalf of the Unit Owners or the Association unless any such contract shall have been made in bad faith or contrary to the provisions of this Declaration. The liability of any Unit Owner arising out of any contract made by such members or officers or out of the aforesaid indemnity shall be limited to such proportion of the total liability thereunder as his percentage interest in the Common Elements bears to the total percentage interest of all the Unit Owners in the Common Elements. Each agreement made by such members or officers or by the managing agent on behalf of the Unit Owners or the Association shall be executed by such members or officers or the managing agent, as the case may be, as agents for the Unit Owners or for the Association.

4. <u>Board's Determination Binding</u>. In the event of any dispute or disagreement between any Unit Owners relating to the Property, or any question of interpretation or application of the provisions of the Declaration or By-Laws, the determination thereof by the Board shall be final and binding on each and all of such Unit Owners.

5. <u>Administration of Property Prior to Election of Initial Board of Managers</u>. Until the election of the initial Board of Managers, the same rights, titles, powers, privileges, trusts, duties and obligations vested in or imposed upon the Board of Managers by the Act and in the Declaration and By-Laws shall be held and performed by the Developer. The election of the initial Board of Managers shall be held not later than sixty (60) days after the conveyance by the Developer of three-fourths (3/4) of the Units or three (3) years after the recording of the Declaration, whichever is earlier. If the initial Board of Managers is not elected by the Unit Owners at the time so established, the Developer shall continue in office for a period of thirty (30) days whereupon wirtten notice of his resignation shall be sent to all of the Unit Owners entitled to vote at such election.

Within sixty (60) days following the election of a majority of the Board of Managers other than the Developer, the Developer shall deliver to the Board of Managers:

       (1) All original documents pertaining to the Property and its administration such as the Declaration, By-Laws, Articles of Incorporation, Condominium Instruments, minutes and code of regulations;

       (2) A detailed accounting by the Developer, setting forth the source and nature of receipts and expenditures in connection with the management, maintenance and operation of the Property;

       (3) Association funds, which shall have been at all times segregated from any other moneys of the Developer;

       (4) A schedule of all personal property, equipment and fixtures belonging to the Association, including documents transferring the Property;

       (5) Any contract, lease, or other agreement made prior to the election of a majority of the Board of Managers

other than the Developer by or on behalf of the Unit Owners.

## ARTICLE VIII

### MAINTENANCE, ALTERATIONS, DECORATING

1. Maintenance, Repairs and Replacements. Each Unit Owner shall furnish and be responsible for, at his own expense, all of the maintenance, repairs and replacements within his own Unit. Maintenance, repairs and replacements of the Common Elements shall be furnished by the Board as part of the common expenses, subject to the rules and regulations of the Board.

The Board may cause to be discharged any mechanics' lien or other encumbrance which, in the opinion of the Board, may constitute a lien against the Property or Common Elements, rather than against a particular Unit and its corresponding percentage of ownership in the Common Elements. When less than all the Unit Owners are responsible for the existence of any such lien, the Unit Owners responsible shall be jointly and severally liable for the amount necessary to discharge the same and for all costs and expenses (including attorneys' fees) incurred by reason of such lien.

Whenever the Board shall determine, in its discretion, that any maintenance or repair of any Unit is necessary to protect the Common Elements or any other portion of the Building, the Board may cause a written notice of the necessity for such maintenance or repair to be served upon such Unit Owner, which notice may be served by delivering a copy thereof to any occupant of such Unit, or by mailing the same by certified or registered mail addressed to the owner at the Unit. If such Unit Owner fails or refuses to perform any such maintenance or repair within a reasonable time stated in the notice (or any extension thereof approved by the Board), the Board may cause such maintenance and repair to be performed at the expense of such Unit Owner.

If, due to the act or neglect of a Unit Owner, or of a member of his family or household pet or of a guest or other authorized occupant or visitor of such Unit Owner, damage shall be caused to the Common Elements or to a Unit or Units owned by others, or maintenance, repairs or replacements shall be required which would otherwise be at the common expense, then such Unit Owner shall pay for such damage and such maintenance, repairs and replacements, as may be determined by the Board, to the extent not covered by insurance.

The Board shall have exclusive authority to take, or refrain from taking, any action pursuant to this Article VIII, Section 1. All expenses which, pursuant to this Section 1, are chargeable to any Unit Owner, may be specifically assessed to such Unit Owner and shall be payable by such Unit Owner as prescribed by the Board.

2. Limited Common Elements. Any charge or expense in connection with expenditures for the Limited Common Elements shall be assessed only against that Unit to which such Limited Common Elements are assigned.

3. Alterations, Additions or Improvements. No alterations of any Common Elements or any additions or improvements thereto, shall be made by any Unit Owner without the prior written approval of the Board. Any Unit Owner may make alterations, additions and improvements within his Unit without the prior written approval of the Board, but in any event such Unit Owner shall be responsibl for any damage to other Units, the Common Elements, or the Property as a result of such alterations, additions or improvements. Nothing shall be done in any Unit, or in, on or to the Common Elements which will impair the structural integrity of the Building or which would structurally change the Building.

-10-

4. _Decorating._ Each Unit Owner shall furnish and be responsible for, at his own expense, all of the decorating within his own Unit from time to time, including painting, wall papering, washing, cleaning, paneling, floor covering, draperies, window shades, curtains, lamps and other furnishings and interior decorating. The use of and the covering of the interior surfaces of windows, whether by draperies, shades or other items visible on the exterior of the Building, shall be subject to the rules and regulations of the Board. Decorating of the Common Elements (other than interior surfaces withing the Units as above provided), and any redecorating of Units to the extent made necessary by any damage to existing decorating of such Units caused by maintenance, repair or replacement work on the Common Elements by the Board, shall be furnished by the Board as part of the common expense.

## ARTICLE IX

### SALE, LEASING OR OTHER ALIENATION

1. _Sale or Lease._ Any Unit Owner other than the Trustee who wishes to sell or lease his Unit Ownership (or any lessee of any Unit wishing to assign or sublease such Unit) shall give to the Board not less than thirty (30) days prior written notice of his intent to sell or lease and subsequently, the terms of any contract to sell or lease, entered into subject to the Board's option as set forth hereinafter together with a copy of such contract, the name, address and financial and character references of the proposed purchaser or lessee and such other informat: concerning the proposed purchaser or lessee and such other information concerning the proposed purchaser or lessee as the Board may reasonably require. The members of the Board acting on behalf of the other Unit Owners shall at all times have the first right and option to purchase or lease such Unit Ownership upon the same terms, which option shall be exercisable for a period of thirty (30) days following the date of receipt of such notice of contract. If said option is not exercised by the Board within said thirty (30) days, the Unit Owner (or lessee) may, at the expiration of said thirty (30) day period and at any time within ninety (90) days after the expiration of said period, proceed to consummate the sale (or sublease or assignment of) such Unit Ownership to the proposed purchaser or lessee named in such notice upon the terms specified therein. If the Unit Owner (or lessee) fails to close said proposed sale or lease transaction within said ninety (90) days, the Unit Ownership shall again become subject to the Board's right of first refusal as herein provided.

2. _Gift._ Any Unit Owner other than the Trustee who wishes to make a gift of his Unit Ownership or any interest therein to any person other than a permit party under Section 10 of this Article IX shall give to the Board not less than ninety (90) days written notice of his or her intent to make such gift prior to the contemplated date thereof, together with the name, address and financial and character references of the intended donee and such other information concerning the intended donees as the Board may reasonably require. If the gift to such party is not consented to by the Board, and the Unit Owner insists on making said gift, the members of the Board acting on behalf of the other Unit Owners, shall at all times have the first right and option to purchase such Unit Ownership or interest therein for cash at fair market value determined by arbitration as hereinafter provided, which option shall be exercisable until the date of expiration as provided herein. In the event that the Board exercises said option and the parties cannot arrive at an agreed price, then within fifteen (15) days after receipt of a written notice by the Board, the Board and the Unit Owner desiring to make such gift shall each select a qualified real estate appraiser. The two appraisers so selected shall within ten (10) days after their selection, appoint another qualified real estate appraiser to act as the arbitrator. Within fifteen (15) days after the appointment of said arbitrator, the arbitrator shall determine the fair market value of the Unit Ownership or interest therein which the Unit Owner contemplates conveying by gift, and shall thereupon give written notice of such determination to the Unit Owner and the Board, and said determination shall be conclusive upon the parties. If either party shall fail to select an appraiser, then the appraiser designated by the other

party shall make the appraisal. The Board's option to purchase the Unit Ownership or interest therein shall expire forty-five (45) days after the date of receipt by it of written notice of such determination of fair market value. The cost of appraisal shall be divided equally between such Unit Owner and the Board and the Board's share shall be a common expense.

3. _Devise_. In the event any Unit Owner dies leaving a will devising his Unit Ownership, or any interest therein to any person or persons not heirs-at-law of the deceased Unit Owner under the Rules of Descent of the State of Illinois, and said will is admitted to probate, the members of the Board acting on behalf of the other Unit Owners, shall have a like option (to be exercised in the manner hereinafter set forth) to purchase said Unit Ownership or interest therein, either from the devisee or devisees thereof named in said will, or if a power of sale is conferred by said will upon the personal representative named therein, from the personal representative acting pursuant to said power, for cash at fair market value which is to be determined by arbitration as herein provided. In the event of a dispute as to purchase price, within sixty (60) days after the appointment of a personal representative for the estate of a deceased Unit Owner, the Board shall appoint a qualified real estate appraiser, and shall thereupon give written notice of such appointment to the said devisee or devisees or personal representative, as the case may be. Within fifteen (15) days thereafter, said devisee or devisees or personal representative, as the case may be shall appoint a qualified real estate appraiser. Within ten (10) days after the appointment of the two (2) said appraisers, the two so appointed shall appoint another qualified real estate appraiser to act as the arbitrator. Within fifteen (15) days thereafter the arbitrator shall determine the fair market value of the Unit Ownership or interest therein devised by the deceased Unit Owner, and shall thereupon give written notice of such determination to the Board and said devisee, devisees or personal representative, as the case may be, and said determination shall be conclusive upon the parties. If either party shall fail to select an appraiser, then the appraiser designated by the other party, shall make the appraisal. The Board's right to purchase the Unit Ownership, or interest therein, at the price determined by the arbitrator shall expire sixty (60) days after the date of receipt by it of such notice if the personal representative of the deceased Unit Owner is empowered to sell, and shall expire eight (8) months after the appointment of a personal representative who is not so empowered to sell. The Board shall be deemed to have exercised its option if it tenders the required sum of money to said devisee or devisees or to said personal representative, as the case may be, within the said option periods. The cost of appraisal shall be equally divided between such Unit Owner and the Board and the Board's share shall be a common expense.

4. _Involuntary Sale_. (a) In the event any Unit Ownership or interest therein is sold at a judicial or execution sale (other than a mortgage foreclosure sale) the person acquiring title through such sale shall, before taking possession of the Unit Ownership so sold, give thirty (30) days written notice to the Board of his intention so to do, whereupon the Board acting on behalf of the other Unit Owners shall have an irrevocable option to purchase such Unit Ownership or interest therein at the same price for which it was sold at said sale. If said option is not exercised by the Board within said thirty (30) days after receipt of such notice, it shall thereupon expire and said purchaser may thereafter take possession of said Unit. The Board shall be deemed to have exercised its option if it tenders the required sum of money to the purchaser within said thirty (30) day period.

(b) In the event any Unit Owner shall default in the payment of any monies required to be paid under the provisions of any mortgage or trust deed against his Unit Ownership, the Board shall have the right to cure such default by paying the amount so owing to the party entitled thereto, and shall thereupon have a lien therefor against such Unit Ownership, which lien shall have the same force and effect and may be enforced in the same manner as provided in Article XVI hereof.

5. _Consent of Voting Members_. The Board shall not exercise any option hereinabove set forth to purchase any Unit Ownership or interest therein without the prior consent of Voting Members having three-fourths (3/4) of the total votes. The

-12-

Board or its duly authorized representative, acting on behalf of the other unit Owners may bid to purchase at any sale of a Unit Ownership or interest therein of any Unit Owner living or deceased, which said sale is held pursuant to an order or direction of a court, upon the prior consent of Voting Members having three-fourths (3/4) of the total votes, which said consent shall set forth a maximum price which Board or its duly authorized representative is authorized to bid and pay for said Unit Ownership or interest therein.

6. <u>Release or Waiver of Option</u>. Upon the consent of at least three-fourths (3/4) of the Board members, any of the options contained in this Article IX may be released or waived and the Unit Ownership or interest therein which is subject to an option set forth in this Article may be sold, conveyed, leased, given or devised free and clear of the provisions of this Article.

7. <u>Proof of Termination of Option</u>. A certificate executed and acknow-ledged by the acting Secretary of the Board stating that the provisions of this Article IX as hereinabove set forth have been met by a Unit Owner, or duly waived by the Board, and that the rights of the Board hereunder have terminated, shall be conclusive upon the Board and the Unit Owners in favor of all persons who rely thereon in good faith, and such certificate shall be furnished to any Unit Owner who has in fact complied with the Provisions of this Article or in respect to whom the provisions of this Article have been waived, upon request at a reasonable fee, not to exceed Ten ($10.00) Dollars.

8. <u>Financing of Purchase Under Option</u>. (a) Acquisitions of Unit Ownership or any interest therein under the provisions of this Article may be made from the maintenance fund or any other financing arrangement as the Board deems desirable. If said fund is insufficient, the Board shall levy an assessment against each Unit Owner as provided for and subject to Article XVI hereof.

(b) If the members of the Board, in their discretion, borrow money to finance the acquisition of any Unit Ownership or interest therein authorized by this Article, no financing may be secured by an encumbrance or hypothecation of any portion of the Property other than the Unit Ownership or interest therein to be acquired.

9. <u>Title to Acquired Interest</u>. Unit Ownership or interest therein acquired pursuant to the terms of this Article shall be held of record in the name of the Board and their successors in office, or such nominee as they shall designate, for the benefit of all the Unit Owners. Said Unit Ownerships or interest therein shall be sold or leased by the members of the Board in such manner as the Board shall determine without complying with the foregoing provisions relating to the Board's right of first refusal. All proceeds of such sale and/or leasing shall be deposited in the maintenance fund and credited to each Unit Owner in the same proportion in which the Board could levy a special assessment under the terms of Section 8(a) of this Article.

10. <u>Exceptions to Board's Right of First Refusal</u>. The Board's right of first refusal as provided in Sections 1, 2 and 3 of this Article IX shall not apply to any sale, lease, gift, devise or transfer by the Trustee, and/or the Deve or by any corporation, trust or other entity when the original Unit Owner or persons having at least majority control of said Unit Owner are in control of the transferree, or resulting from statutory merger or consolidation, or between co-owners of the same Unit, or any one or more of them, or to any trustee of a trust, sole beneficiary or beneficiaries of which are the Unit Owner, the spouse or lawful child of the Unit Owner, or any one or more of them, or from any trustee of a trust to any one or more of the beneficiaries thereof.

11. <u>Miscellaneous</u>. If a proposed sale, lease, devise or gift of any Unit Ownership is made by any Unit Owner, after compliance with the foregoing provisions, the purchaser, lessee, devisee, or donee thereunder shall be bound by and be subject to all of the obligations of such Unit Owner with respect to such Unit Ownership as provided in this Declaration, and in the case of a lease, said lease shall expressly so provide. The Unit Owner making any such lease shall not be relieved thereby from any of his obligations hereunder. Upon the expiration or termination of such lease, or in the event of any attempted subleasing thereunder,

-13-

the provisions hereof with respect to the Board's right of first option shall apply to such Unit Ownership. If any sale, lease, devise or gift of a Unit Ownership is made or attempted by any Unit Owner without complying with the foregoing provision such sale, lease, devise or gift shall be subject to each and all of the rights and options of the Board hereunder and each and all of the remedies and actions available to the Board hereunder or at law or in equity in connection therewith. The foregoing provisions with respect to the Board's right of first option as to any proposed sale, lease, devise or gift shall be and remain in full force and effect until the Property as a whole shall be sold or removed from the provisions of the Act, as provided in th Act, unless sooner rescinded or amended by the Unit Owners in the manner herein provided for amendments of this Declaration. The Board may adopt rules and regulations from time to time, not inconsistent with the foregoing provisions, for the purpose of implementing and effectuating the same.

## ARTICLE X

### DAMAGE OR DESTRUCTION AND RESTORATION OF BUILDING

1. <u>Sufficient Insurance</u>. In the event the improvements forming a part of the Property, or any portion thereof, including any Units, shall suffer damage or destruction from any cause and the proceeds of any policy or policies insuring against such loss or damage, and payable by reason thereof, shall be sufficient to pay the cost of repair or restoration or reconstruction, then such repair, restoration or reconstruction shall be undertaken and the insurance proceeds shall be applied by the Board or the payee of such insurance proceeds in payment therefor; provided, however, that in the event within one-hundred and eighty (180) days after said damage or destruction, the Unit Owners shall elect either to sell the Property as hereinafter provided in Article XII hereof or to withdraw the Property from the provisions of this Declaration, and from the provisions of the Act as therein provided, then such repair, restoration or reconstruction shall not be undertaken. In the event such repair, restoration or reconstruction is not undertaken the net proceeds of insurance policies shall be divided by the Board or the payee of such insurance proceeds among all Unit Owners according to each Unit Owner's percentage of ownership in the Common Elements as set forth in Exhibit "B", after first paying out of the share of each Unit Owner the amount of any unpaid liens on his Unit, in the order of the priority of such liens.

1. <u>Insufficient Insurance</u>. (a) If the insurance proceeds are insufficient to reconstruct the Building and the Unit Owners and all other parties in interest do not voluntarily make provision for reconstruction of the Building within one-hundred and eighty (180) days from the date of damage or destruction, the Board of Managers may record a notice setting forth such facts and upon the recording of such notice:

    (i)   The Property shall be deemed to be owned in common by the Unit Owners;

    (ii)  The undivided interest in the Property owned in common which shall appertain to each Unit Owner shall be the percentage of undivided interest previously owned by such owner in the Common Elements;

    (iii) Any liens affecting any of the Units shall be deemed to be transferred in accordance with the existing priorities to the undivided interest of the Unit Owner in the Property as provided herein; and

    (iv)  The Property shall be subject to an action, for partition at the suit of any Unit Owner, in which event the net proceeds of sale, together with the net proceeds of the insurance on the Property, if any, shall be considered as one fund and shall be divided among all the Unit Owners in a percentage

-14-

equal to the percentage of undivided interest owned by each owner in the Property, after first paying out of the respective shares of the Unit Owners, to the extent sufficient for the purpose, all liens on the undivided interest in the Property owned by each Unit Owner.

(b)    In the case of damage or other destruction in which fewer than one-half (1/2) of the Units are rendered un-inhabitable, upon the affirmative vote of not fewer than three-fourths (3/4) of the Unit Owners voting at a meeting called for that purpose, the Building or other portion of the Property shall be reconstructed. The meeting shall be held within thirty (30) days following the final adjustment of insurance claims, if any. Otherwise, such meeting shall be held within ninety (90) days of the occurrence. At such meeting the Board of Managers, or its representative, shall present to the members present an estimate of the cost of repair or reconstruction, and the estimated amount of necessary assessments against each Unit Owner.

(c)    In the case of damage or other destruction, upon the affirmative vote of not fewer than three-fourths (3/4) of the Unit Owners voting at a meeting called for that purpose, any portion of the Property affected by such damage or destruction may be withdrawn from the Act. Upon the withdrawal of any Unit or portion thereof, the percentage of interest in the Common Elements appurtenant to such Unit or portion thereof shall be reallocated among the remaining Units on the basis of the percentage of interest of each remaining Unit. If only a portion of a Unit is withdrawn, the percentage of interest appurtenant to that Unit shall be reduced accordingly, upon the basis of diminution in market value of the Unit, as determined by the Board of Managers. The payment of just compensation, or the allocation of any insurance or other proceeds to any withdrawing or remaining Unit Owner shall be on an equitable basis, which need not be a Unit's percentage interest. Any insurance or other proceeds available in connectic with the withdrawal of any portion of the Common Elements, not necessarily including the Limited Common Elements, shall be allocated on the basis of each Unit Owner's percentage interest therein. Any proceeds available from the withdrawal of any Limited Common Elements, will be distributed in accordance with the interest of those entitled to their use.

3.    Cessation of Common Expenses.  Upon the withdrawal of any Unit or portion thereof, the responsibility for the payment of assessments on such Unit or portion thereof by the Unit Owner shall cease.

ARTICLE XI

EMINENT DOMAIN

1.    Reallocation of Common Elements and Condemnation Award.  Upon the withdrawal of any Unit or portion thereof due to eminent domain, the percentage of interest in the Common Elements appurtenant to such Unit or portion thereof shall be reallocated among the remaining Units on the basis of the percentage of interest of each remaining Unit. If only a portion of a Unit is withdrawn, the percentage of interest appurtenant to that Unit shall be reduced accordingly, upon the basis of diminution in market value of the Unit, as determined by the Board of Managers. The allocation of any condemnation award or other proceeds to any withdrawing or remaining Unit Owner shall be on an equitable basis, which need not be a Unit's percentage interest. Any condemnation award or other proceeds available in connection with the withdrawal of any portion of the Common Elements, not necessarily including the Limited Common Elements, shall be allocated on the basis of each Unit Owner's percentage interest therein. Proceeds available from th withdrawal of any Limited Common Element will be distributed in accordance with the interests of those entitled to their use.

-15-

2. <u>Cessation of Common Expenses</u>. Upon the withdrawal of any Unit or portion thereof, the responsibility for the payment of assessments on such Unit or portion thereof by the Unit Owner shall cease.

ARTICLE XII

SALE OF THE PROPERTY

The Unit Owners through the affirmative vote of Voting Members having at least three-fourths (3/4) of the total votes, at a meeting duly called for such purpose, may elect to sell the Property as a whole. Within ten (10) days after the date of the meeting at which such sale was approved the Board shall give written notice of such action to the holder of any duly recorded mortgage or trust deed against any Unit Ownership entitled to notice under Section 1 of Article XIX of this Declaration. Such action shall be binding upon all Unit Owners, and it shall thereupon become the duty of every Unit Owner to execute and deliver such instruments and to perform all acts as in manner or form may be necessary to effect such sale, provided, however, that any Unit Owner who did not vote in favor of such action and who has filed written objection thereto with the Board within twenty (20) days after the date of the meeting at which such sale was approved shall be entitled to receive from the proceeds of such sale an amount equivalent to the fair market value of his interest, as determined by arbitration as hereinafter provided, less the amount of any unpaid assessments or charges due and owing from such Unit Owner. In the absence of agreement on the fair market value of such interest, such Unit Owner and the Board shall each select an appraiser, and two so selected shall select a third, and the fair market value, as determined by said third appraiser, shall con If either party shall fail to select an appraiser, then the one designated by the other party shall make the appraisal. The cost of the appraisal shall be divided equally between such Unit Owner and the Board, and the Board's share shall be a common expense.

ARTICLE XIII

BY-LAWS

The provisions of Articles XIV, XV, XVI, XVII and XVIII shall constitute the By-Laws of the Association and the By-Laws prescribed by the Act.

ARTICLE XIV

BOARD OF MANAGERS

1. <u>Board of Managers (Board of Directors)</u>. (a) The direction and administration of the Property shall be vested in a Board of Managers, consisting of <u>three</u> persons who shall be appointed or elected in the manner herein provided Each member of the Board shall be one of the Unit Owners and shall reside on the Property, provided, however, that in the event a Unit Owner is a corporation, partnership, trust or other legal entity other than a natural person or persons, then any officer, director or other designated agent of such corporation, partner of such partnership, beneficiary or other designated agent of such trust or manager of such other legal entity, shall be eligible to serve as a member of the Board, provided such person must <u>reside on the Property</u> unless he is a Board member nominated by the Trustee.

-16-

(b) At the initial meeting the voting members shall elect the three (3) Board members. In all elections for members of the Board, each voting member shall be entitled to cumulate his votes in the manner provided by law and the candidates receiving the highest number of votes with respect to the number of offices to be filled shall be deemed to be elected. Members of the Board elected at the initial meeting shall serve until the first annual meeting. Three (3) Board members shall be elected at the first annual meeting. The three (3) persons receiving the highest number of votes at the first annual meeting shall be elected to the Board for a term of one (1) year. Upon the expiration of the terms of office of the Board members so elected at the first annual meeting and thereafter, successors shall be elected for a term of one (1) year each. The voting members having at least two-thirds (2/3) of the total votes may from time to time increase or decrease such number of persons on the Board or may increase or decrease the term of office of Board members at any annual or special meeting, provided that such number shall not be less than three (3), and that the terms of at least one-third (1/3) of the persons on the Board shall expire annually and that no Board member or officer shall be elected to a term in excess of two (2) years; provided, however, that a Board member or officer may be re-elected at the expiration of his term. Members of the Board shall receive no compensation for their services, unless expressly authorized by the Board with the approval of voting members having two-thirds (2/3) of the total votes. Vacancies in the Board, including vacancies due to any increase in the number of persons on the Board, shall be filled by the voting members present at the next annual meeting or at a special meeting of the voting members called for such purpose. Except as otherwise provided in this declaration, the property shall be managed by the Board and the Board shall act by majority vote of those present at its meeting when a quorum exists. A majority of the total number of the members of the Board shall constitute a quorum. Meetings of the Board may be called, held, and conducted in accordance with such resolutions as the Board may adopt.

*[handwritten in margin: Quorum = 2/3]*

(c) The Board shall elect from among its members a President who shall preside over both its meetings and those of the Voting Members, and who shall be the chief executive officer of the Board and the Association and who shall execute amendments to the Condominium Instruments; a Secretary who shall keep the minutes of all meetings of the Board and of the Voting Members, who shall mail and receive all notices, and who shall, in general, perform all the duties incident to the office of Secretary; a Treasurer to keep the financial records and books of account, and such additional officers as the Board shall see fit to elect. Any Officers may be removed at any meeting by the affirmative vote of the majority of the Members of the Board, either with or without cause, and any vacancy in any office may be filled by the Board at any meeting thereof.

(d) Any Board member may be removed from office by affirmative vote of the Voting Members having at least two-thirds (2/3) of the total votes, at any special meetings called for the purpose. A successor to fill the unexpired term of a Board member removed may be elected by the Voting Members at the same meeting or any subsequent annual meeting or special meeting called for that purpose.

(e) The Board shall meet at least four (4) times annually, on the first Monday of February, May, August and November and at such other times as the Board deems necessary. Meetings of the Board shall be open to any Unit Owner, notice of any such meeting shall be mailed at least forty-eight (48) hours prior thereto, unless a written waiver of such notice is signed by the person or persons entitled to such notice.

2. General Powers of the Board. The powers and duties of the Board of Managers shall include, but shall not be limited to the following matters:

(a) operation, care, upkeep, maintenance, replacement and improvement of the Common Elements;

(b) preparation, adoption and distribution of the

-17-

annual budget for the Property;

(c)  levying of assessments;

(d)  collection of assessments from Unit Owners;

(e)  employment and dismissal of the personnel necessary or advisable for the maintenance and operation of the Common Elements;

(f)  obtaining adequate and appropriate kinds of insurance;

(g)  owning, conveying, encumbering, leasing and otherwise dealing with Units conveyed to or purchased by it;

(h)  adoption and amendment of rules and regulations covering the details of the operation and use of the Property;

(i)  keeping of detailed, accurate records of the receipts and expenditures affecting the use and operation of the Property;

(j)  to have access to each Unit from time to time as may be necessary for the maintenance, repair or replacement of any Common Elements therein or accessible therefrom, or for making emergency repairs therein necessary to prevent damage to the Common Elements or to other Unit or Units;

(k)  to pay for water, waste removal, other operating expenses, electricity, telephone and other necessary utility service for the Common Elements;

(l)  to pay for landscaping, gardening, snow removal, painting, cleaning, tuckpointing, maintenance, decorating, repair and replacement of the Common Elements (but not including the windows and glass doors appurtenant to the Unit, if any, and the interior surfaces of the Units and of the hallway doors appurtenant thereto, which the Unit Owner shall paint, clean, decorate, maintain and repair, except if necessitated by repairs to the Common Elements) and such furnishings and equipment for the Common Elements as the Board shall determine are necessary and proper, and the Board shall have the exclusive right and duty to acquire the same for the Common Elements;

(m)  to pay for any other materials, supplies, furniture, labor, services, maintenance, structural alterations or assessments which the Board is required to secure or pay for pursuant to the terms of this Declaration or By-Laws of which in its opinion shall be necessary or proper for the maintenance and operation of the Property, as a first class condominium apartment building or for the enforcement of these restrictions;

(n)  to pay any amount necessary to discharge any mechanic's lien or other encumbrance against the entire Property or any part thereof which may in the opinion of the Board constitute a lien against the Property or against the Common Elements, rather than merely against the interests

therein of particular Unit Owners. Where one
or more Unit Owners are responsible for the
existence of such lien, they shall be jointly
and severally liable for the cost of discharging
it and any costs incurred by the Board by reason
of said lien or liens shall be specially assessed
to said Unit Owners;

(o)   to maintain and repair any Unit if such maintenance
or repair is necessary, in the discretion of the
Board, to protect the Common Elements or any other
portion of the Building, and a Unit Owner of any
Unit that has failed or refused to perform said
maintenance or repair within a reasonable time
after written notice of the necessity of said
maintenance or repair mailed or delivered by the
Board to said Unit Owner, provided that the Board
shall levy a special assessment against such
Unit Owner for the cost of said maintenance or repair;

(p)   the Board or its agent upon reasonable notice may
enter any Unit when necessary in connection with
any maintenance or construction for which the
Board is responsible. Such entry shall be made
with as little inconvenience to the Unit Owner as
practicable, and any damage caused thereby shall
be repaired by the Board as a common expense;

(q)   the Board's powers hereinabove enumerated and
described in the Declaration, shall be limited in
that the Board shall have no authority to acquire
and pay for any structural alterations, additions
to, or improvements of the Common Elements (other
than for purposes of replacing or restoring portions
of the Common Elements, subject to all the provisions
of this Declaration) requiring an expenditure in
excess of Five Thousand ($5,000.00) Dollars, without
in each case the prior approval of Voting Members
having two-thirds (2/3) of the total votes;

(r)   all agreements, contracts, deeds, leases, vouchers
for payment of expenditures and other instruments
shall be signed by such officer or officers, agent
or agents of the Board and in such manner as from
time to time shall be determined by written resolution
of the Board. In the absence of such determination
by the Board, such documents shall be signed by the
Treasurer and countersigned by the President of the
Board;

(s)   the Board may adopt such reasonable rules and
regulations, not inconsistent herewith, as it may
deem advisable for the maintenance, administration,
management, operation, use, conservation and
beautification of the Property, and for the health,
comfort, safety and general welfare of the Unit
Owners and Occupants of the Property. Written
notice of such rules and regulations shall be given
to all Unit Owners and Occupants and the entire
Property shall at all times be maintained subject
to such rules and regulations;

(t)   the Board may engage the services of an agent to
manage the Property to the extent deemed advisable
by the Board;

-19-

(u)   Nothing hereinabove contained shall be construed to give the Board, Association, or Unit Owners authority to conduct an active business for profit on behalf of all the Unit Owners or any of them;

(v)   upon authorization by the affirmative vote of not less than a majority of the Voting Members at a meeting duly called for such purposes, the Board, acting on behalf of all Unit Owners, shall have the power to seek relief from or in connection with the assessment or levy of any real property taxes, special assessments and any other special taxes or charges of the State of Illinois or any political subdivision thereof, or any other lawful taxing or assessing body, which are authorized by law to be assessed and levied on real property and to charge and collect all expenses incurred in connection therewith as common expenses.

## ARTICLE XV

### MEMBERS

#### (UNIT OWNERS)

1.  Voting Rights.  There shall be one person with respect to each Unit Ownership who shall be entitled to vote at any meeting of the Unit Owners.  Such Voting Members shall be the Unit Owner or one of the group composed of all the Unit Owners of a Unit Ownership or may be some person designated by such Unit Owners to act as proxy in his or their behalf and who need not be a Unit Owner.  Such designations shall be made in writing to the Board and shall be revocable at any time by actual notice to the Board of the death or judicially declared incompetence of any designator, or by written notice to the Board by the Unit Owner or Unit Owners.  Any or all Unit Owners of a Unit Ownership, and their designee, if any, may be present at any meeting of the Voting Members, but only the Voting Member of the Unit Ownership may vote or take any other action as a Voting Member either in person or by proxy.  The total number of votes of all Voting Members shall be 100, and each Unit Owner or group of Unit Owners shall be entitled to the number of votes equal to the total of the percentage of ownership in the Common Elements applicable to his or their Unit Ownership as set forth in Exhibit "B".  The Trustee shall designate the Voting Member with respect to any Unit Ownership owned by the Trustee.  The Association shall have one class of membership only and that nothing contained in these Condominium Instruments shall permit or allow different classes of membership among the Unit Owners.

2.  Meetings.  (a)  Meetings of the Voting Members shall be held at the Property or at such other place in Cook County, Illinois, as may be designated in any notice of a meeting.  The presence in person or by proxy at any meeting of the Voting Members of at least a majority of the Voting Members and Voting Members having at least a majority of the total votes shall constitute a quorum.  Unless otherwise expressly provided herein, any action may be taken at any meeting of the Voting Members at which a quorum is present upon the affirmative vote of the Voting Members having a majority of the total votes represented at such meeting.

(b)   The initial meeting of the Voting Members shall be held upon written notice given by the Trustee or the Developer.  The notice shall be given not less than ten (10) days prior to the date of the meeting.  The notice shall provide for a meeting to elect the initial Board of Managers.  The initial Board shall be elected not later than sixty (60) days after the conveyance by the Developer of three-fourths (3/4) of the Units or three (3) years after the recording of the Declaration, whichever is earlier.  The giving of the notice and the date for the meeting specified in said notice shall comply with this requirement.  Thereafter, there shall be an annual meeting of the Voting Members on the first Wednesday of November following such initial meeting and on the first Wednesday of each

-20-

succeeding November thereafter at 7:30 P.M., or at such other reasonable time or date (not more than thirty (30) days before or after such date) as may be designate by written notice of the Board delivered to the Voting Members not less than ten (10) days or more than thirty (30) days prior to the date fixed for said meetin

(c)  Special meetings of the Voting Members may be called at any time for the purpose of considering matters which, by the terms of this Declaration, require the approval of all or some of the Voting Members, or for any other reasonable purpose.  Said meetings shall be called by written notice, authorized by the President of the Board, a majority of the Board, or by the Voting Members having twenty (20%) percent of the total votes and delivered not less than ten (10) days or more than thirty (30) days prior to the date fixed for said meeting.  The notices shall specify  the date, time and place of the meeting and th matters to be considered.  Matters to be submitted at special meetings of the Votir Members shall first be submitted to the Board of Managers, at least ten (10) days prior to the special meeting, who shall then submit the matters to the Voting Membe

3.  Notices of Meetings.  Notices of meetings required to be given herein may be delivered either personally or by mail to the person entitled to vote therea addressed to each such person at the address given by him to the Board for the purpose of service of such notice, or to the Unit of the Unit Owner with respect to which such voting right appertains, if no address has been given to the Board.

4.  Miscellaneous.  (a)  No merger or consolidation of the Association, sale, lease, exchange, mortgage, pledge or other disposition of all, or sub- stantially all of the Property and assets of the Association; and the purchase or sale of land or of Units on behalf of all Unit Owners shall be effectuated unless there is an affirmative vote of three-quarters   of the votes of Unit Owners, except as otherwise provided for in the Declaration.

(b)  When thirty (30%) percent or fewer of the Units by number, possess over fifty (50%) percent in the aggregate of the votes in the Association, any percentage vote of members specified in the Condominium Instrumer or the Act, shall require instead the specified percentage by number of Units rath than by percentage of interest in the Common Elements allocated to Units that woul otherwise be applicable.

## ARTICLE XVI

### ASSESSMENTS – MAINTENANCE FUND

1.  Estimated Annual Budget and Assessments.  Each year on or before November 1, the Board shall estimate the total amount necessary to pay the cost c all common expenses which will be required during the ensuing calendar year for t rendering of all services, together with a reasonable amount considered by the Ba to be necessary for a reserve for contingencies and replacements.  The annual budget shall set forth with particularity all anticipated common expenses by category as well as all anticipated assessments and other income.  The budget sha also set forth each Unit Owners proposed common expense assessment.  Each Unit O shall receive, at least thirty (30) days prior to the adoption thereof by the Boa of Managers, a copy of the proposed annual budget; the annual budget shall also take into account the estimated net available cash income for the year from the operation or use of the Common Elements, if any.  The "estimated annual budget" shall be assessed to the Unit Owners according to each Unit Owners' percentage o ownership in the Common Elements as set forth in Exhibit "B" attached hereto. Each Unit Owner shall receive notice in the same manner as is provided in this Declaration for membership meetings, or any meeting of the Board of Managers concerning the adoption of the proposed annual budget or any increase, or establh of an assessment, unless a written waiver of such notice is given by the person or persons entitled to  such notice before the meeting is convened.    On or

-21-

before January 1st of the ensuing year, and the first of each and every month of said year, said Unit Owner jointly and severally shall be personally liable for and obligated to pay to the Board or as it may direct one-twelfth (1/12) of the assessment against his Unit Ownership made pursuant to this Section. On or before April 1 of each calendar year following the year in which the initial meeting is held, the Board shall supply to all Unit Owners an itemized accounting of the common expenses for the preceding year actually incurred and paid, together with a tabulation of the amounts collected pursuant to the budget or assessments, and showing the net excess or deficit of income over expenditures plus reserves. Any amount accumulated in excess of the amount required for actual expenses and reserves shall be credited according to each Unit Owner's percentage of ownership in the Common Elements to the next monthly installments due from Unit Owners under the current year estimate, until exhausted, and any net shortage shall be added according to each Unit Owners percentage of ownership in the Common Elements to the installments due in the succeeding six (6) months after rendering of the accounting.

2. Reserves and Adjustments. The Board shall establish and maintain a reasonable reserve for contingencies and replacements. Any extraordinary or non-recurring common expense, any common expense not set forth in the budget as adopted, and any increase in assessments over the amount adopted shall be separately assessed against all Unit Owners. Any such separate assessment shall be subject to approval by the affirmative vote of at least two-thirds (2/3) of the Unit Owners voting at a meeting of such Unit Owners duly called for the purpose of approving the assessment if it involves proposed expenditures resulting in a total payment assessed to a Unit Owner equal to the greater of five (5) times the Unit's most recent common expense assessment calculated on a monthly basis or three-hundred ($300.00) dollars. All Unit Owners shall be personally liable for and obligated to pay their respective adjusted monthly amount.

*[handwritten margin notes: Need 1/3 approval / 5 X monthly Common Expense]*

3. Initial Estimate of Annual Budget. When the first Board elected or appointed hereunder takes office it shall determine the "estimated annual budget" as hereinabove defined, for the period commencing thirty (30) days after said election and ending on December 31st of the calendar year in which said election occurs. Assessments shall be levied against the Unit Owners during said period as provided in Section 1 of this Article.

4. Failure to Prepare Estimates. The failure or delay of the Board to prepare or serve the annual or adjusted estimate on the Unit Owner shall not constitute a waiver or release in any manner of such Unit Owner's obligation to pay the maintenance costs and necessary reserves, as herein provided, whenever the same shall be determined, and in the absence of any annual estimate or adjusted estimate the Unit Owner shall continue to pay the monthly maintenance charge at the then existing monthly rate established for the previous period until the next monthly maintenance payment which is due not more than ten (10) days after such new annual adjusted estimate shall have been mailed or delivered.

5. Books and Records. The Board shall keep full and correct books of account in chronological order of the receipts and expenditures affecting the Common Elements, specifying and itemizing the maintenance and repair expenses of Common Elements and any other expenses incurred. Such records and the vouchers authorizing the payments shall be available for inspection by any Unit Owner or a representative of a Unit Owner duly authorized in writing, at such reasonable time or times during normal business hours as may be requested by the Unit Owner. Upon ten (10) days' notice to the Board and payment of a reasonable fee, any Unit Owner shall be furnished a statement of his account setting forth the amount of any unpaid assessments or other charges due and owing from such Unit Owner.

6. Use of Funds. All funds collected hereunder shall be held and expended for the purpose designated herein, and (except for such special assessment as may be levied hereunder against less than all the Unit Owners and for such adjustments as may be required to reflect delinquent or prepaid assessments) shall be deemed to be held for the benefit, use and account of all the Unit Owners in percentages set forth in Exhibit "B".

-22-

7.  Insurance.  Any insurance premiums assessed on a basis reflecting increased charges for coverage on certain Units shall be assessed to such Unit.

8.  Assessments.  If a Unit Owner is in default in the monthly payment of the aforesaid charges or assessments for thirty (30) days, the members of the Board may bring suit for and on behalf of themselves and as representatives of all Unit Owners, to enforce collection thereof or to foreclose the lien therefor as hereinafter provided; and there shall be added to the amount due the costs of said suit, and other fees and expenses together with legal interest and reasonable attorneys' fees to be fixed by the Court.  To the extent permitted by any decision or any statute or law now or hereafter effective, the amount of any delinquent and unpaid charges or assessments, and interest, costs and fees as above provided, shall be and become a lien or charge against the Unit Ownership of the Unit Owner involved when payable and may be foreclosed by an action brought in the name of the Board as in the case of foreclosure of liens against real estate.  Such lien shall take effect and be in force when and as provided in the Act; provided, however, that encumbrances owned or held by any bank, insurance company, savings and loan association or other lender shall be subject as to priority after written notice to said encumbrancer of unpaid common expenses only to the lien of all common expenses on the encumbered Unit Ownership which become due and payable subsequent to the date the encumbrancer either takes possession of the Unit, accepts a conveyance of any interest in the Unit Ownership or has a receiver appointed in a suit to foreclose its lien.  In addition to the foregoing, the Board or its agents shall have such other rights and remedies to enforce such collection as shall otherwise be provided or permitted by law from time to time.  Without limiting the generality of the fore-going, if any Unit Owner shall fail to pay the proportionate share of the Common Expenses or of any other expenses required to be paid hereunder when due, such rights and remedies shall include:  (1)  the right to enforce the collection of such defaulting Unit Owner's share of such expenses (whether due by acceleration or otherwise), together with interest thereon, at the maximum rate permitted by law, and all fees and costs (including reasonable attorney's fees) incurred in the collection thereof; (2)  the right, by giving such defaulting Unit Owner five days' written notice of the election of the Board so to do, to accelerate the maturity of the unpaid installments of such expenses accruing with respect to the balance of the assessment year; and (3) the right to take possession of such defaulting Unit Owner's interest in the Property, to maintain for the benefit of all the other Unit Owners an action for possession in the manner prescribed in "an Act in regard to Forcible Entry and Detainer" approved February 16, 1874 as amended and to execute leases of such defaulting Unit Owner's interest in the Property and apply the rents derived therefrom against such expenses.

9.  Nonuse.  No Unit Owner may waive or otherwise escape liability for the assessments provided for herein by nonuse of the Common Elements or abandonment of his Unit.

## ARTICLE XVII

### COVENANTS AND RESTRICTIONS AS TO USE AND OCCUPANCY

The Units and Common Elements shall be owned, occupied and used subject to the following covenants and restrictions:

1.  General Use.  No part of the Property shall be used for other than housing and related common purposes for which the Property was designed.  Each Unit or any two or more adjoining Units used together shall be used as a residence for a single family or such other uses permitted by this Declaration and for no other purpose.  That part of the Common Elements separating any two or more adjoinin Units used together as aforesaid may be altered to afford ingress and egress to and from such adjoining Units in such manner and upon such conditions as shall be determined by the Board in writing.

2.  Obstruction of Common Elements and Unit Maintenance.  There shall be no obstruction of the Common Elements nor shall anything be stored in the Common Elements without prior consent of the Board except as herein expressly provided.

-23-

Each Unit Owner shall be obligated to maintain and keep in good order and repair his own Unit.

3.  Prohibited Use.  Nothing shall be done or kept in any Unit, or in the Common Elements which will increase the rate of insurance on the Building or contents thereof, applicable for residential use, without the prior written consent of the Board.  No Unit Owner shall permit anything to be done or kept in his Unit, or in the Common Elements which will result in the cancellation of insurance on the Building, or contents thereof, or which would be in violation of any law.  No waste shall be committed in the Common Elements.  No Unit Owner shall overload the electric wiring in the Building, or operate any machines, appliances, accessories or equipment in such manner as to cause, in the judgment of the Board, an unreasonabl disturbance to others, or connect any machines, appliances, accessories or equipment to the heating or plumbing system, without the prior written consent of the Board.

4.  Unit Owner Insurance.  Each Unit Owner shall be responsible for his own insurance on his personal property in his own Unit, his personal property stored elsewhere on the Property and his personal liability to the extent not covered by the liability insurance for all the Unit Owners obtained by the Board as hereinbefore provided.

5.  Exterior Attachments.  Unit Owners shall not cause or permit anything to be placed on the outside walls of the Building and no sign, awning, canopy, shutter, radio or television antenna shall be affixed to or placed upon the exterior walls or roof or any part thereof, without the prior consent of the Board.

6.  Window Treatment.  The use and the covering of the interior surfaces of the glass windows and/or doors appurtenant to the Units of the Building, whether by draperies, shades or other items visible from the exterior of the Buildin shall be subject to the rules and regulations of the Board.

7.  Floor Coverings.  In order to enhance the soundproofing of the Building the floor covering for all occupied Units shall meet a certain minimum standard as may be specified by rules and regulations of the Board.

8.  Pets, etc.  No animals, reptiles, rabbits, livestock, fowl or poultry of any kind shall be raised, bred or kept in any Unit or in the Common Elements, except that dogs, cats, or other household pets may be kept in Units, subject to rules and regulations adopted by the Board, provided that they are not kept, bred or maintained for any commercial purpose, and provided further that any such pet causing or creating a nuisance or unreasonable disturbance shall be permanently removed from the Property upon three (3) days' written notice from the Board.

9.  Nuisances.  No noxious or offensive activity shall be carried on in any Unit or in the Common Elements, nor shall anything be done therein, either willfully or negligently, which may be or become an annoyance or nuisance to the other Unit Owners or Occupants.

10.  Unsightliness.  No clothes, sheets, blankets, laundry or any kind of other articles shall be hung out or exposed on any part of the Common Elements.  The Common Elements shall be kept free and clear of rubbish, debris and other unsightly materials.

11.  Personal Effects.  There shall be no playing, lounging, parking of baby carriages or playpens, bicycles, wagons, toys, vehicles, benches or chairs on any part of the Common Elements except that baby carriages, bicycles and other personal property may be stored in the common storage area designated for that purpose.

12.  Commercial Activities.  No industry, business, trade, occupation or profession of any kind, commercial, religious, educational, or otherwise, designated for profit, altruism, exploration, or otherwise, shall be conducted, maintained or permitted in any Unit.

13.  For Sale and For Rent Signs.  No "For Sale" or "For Rent" signs, advertising or other displays shall be maintained or permitted on any part of the

Property except at such location and in such form, as shall be determined by the Board; provided that the right is reserved by the Trustee, the Developer and their agents, to maintain on the Property until the sale of the last Unit, all models, sales offices and advertising signs, banners, and lighting in connection therewith, at such locations and in such forms as they shall determine, together with the right of ingress, egress and transient parking therefor through the Common Elements.

14.  Common Elements.  Nothing shall be altered or constructed in or removed from the Common Elements, except upon the written consent of the Board.

15.  Exceptions.  The Unit restrictions in Paragraphs 1 and 12 of this Article XVII shall not, however, be construed in such a manner as to prohibit a Unit Owner from:  (a) maintaining his professional library therein, (b) keeping his personal business or professional records or accounts therein, or (c) handling his personal business or professional telephone calls or correspondence therefrom. Such uses are expressly declared customarily incident to the principal residential use and not in violation of Sections 1 and 12 of this Article XVII.

## ARTICLE XVIII

### REMEDIES FOR BREACH OF COVENANTS

### RESTRICTIONS AND REGULATIONS

1.  Abatement and Enjoinment.  The violation of any restriction, or condition or regulation adopted by the Board, or the breach of any covenant or provisions herein contained, shall give the Board the right, in addition to the rights set forth in the next succeeding section:  (a) to enter upon that part of the Property where such violation or breach exists and summarily abate and remove, a the expense of the defaulting Unit Owner, any structure, thing or condition that may exist thereon contrary to the intent and the provisions hereof, and the Trustee, the Developer, or their successors or assigns, or the Board, or its agents, shall not thereby be deemed guilty in any manner of trespass; or, (b) to enjoin, abate or remedy by appropriate legal proceeding, either by law or in equity, the continuance of any breach.  All expenses of the Board in connectic with such actions or proceedings, including court costs and attorneys' fees and expenses, and all damages, liquidated or otherwise, together with interest thereon at the rate of one percent (1%) per month until paid, shall be charged to and assess against such defaulting Unit Owner and shall be added to and deemed part of his respective share of the common expenses, and the Board shall have a lien for all of the same upon the Unit Ownership of such defaulting Unit Owner and upon all of his additions and improvements thereto and upon all his personal property in his Unit or located elsewhere on the Property.  Any and all of such rights and remedies may be exercised at any time and from time to time, cumulatively or otherwise by the Board.

2.  Involuntary Sale.  If any Unit Owner (either by his own conduct or by the conduct of any Occupant of his Unit) shall violate any of the covenants or restrictions or provisions of this Declaration, or the regulations adopted by th Board, and such violation shall continue for thirty (30) days after notice in writing from the Board, or shall re-occur more than once after such notice, then the Board shall have the power to issue to the defaulting Unit Owner a ten (10) day notice in writing to terminate the rights of said defaulting Unit Owner to continue as a Unit Owner and to continue to occupy, use or control his Unit and thereupon an action in equity may be filed by the members of the Board against the defaulting Unit Owner for a decree of mandatory injunction against Unit Owner or Occupant or, in the alternative, for a decree declaring the termination of the defaulting Unit Owner's right to occupy, use or control the Unit owned by him on account of the said violation, and ordering that the right, title and interest of the Unit Owner in the Property shall be sold (subject to the lien of any existin mortgage) at a judicial sale upon such notice and terms as the court shall establis except that the court shall enjoin and restrain the defaulting Unit Owner from re-acquiring his interest in the Property at such judicial sale.  The proceeds

-25-

of any such judicial sale shall first be paid to discharge court costs, court reporter charges, reasonable attorney's fees and all other expenses of the proceeding and sale, and all such items shall be taxed against the defaulting Unit Owner in said decree. Any balance of proceeds, after satisfaction of such charges and any unpaid assessments hereunder or any liens, shall be paid to the Unit Owner. Upon the confirmation of such sale, the purchaser thereat shall thereupon be entitled to a deed to the Unit Ownership and, to immediate possession of the Unit sold and may apply to the court for a writ of assistance for the purpose of acquiring such possession, and it shall be a condition of any such sale, and the decree shall provide, that the purchaser shall take the interest in the Property sold subject to this Declaration.

ARTICLE XIX

GENERAL PROVISIONS

1.  <u>Notice to Mortgagees</u>.  Upon written request to the Board, the holder of any duly recorded mortgage or trust deed against any Unit Ownership shall be given a copy of any and all notices permitted or required by this Declaration to be given to the Unit Owner whose Unit Ownership is subject to such mortgage or trust deed.

2.  <u>Notices to Board, Association and Unit Owners</u>.  Notices provided for in this Declaration and in the Act shall be in writing, and shall be addressed to the Board or Association, or any Unit Owner, as the case may be, at

(indicating thereon the number of the respective Unit if addressed to a Unit Owner), or at such other address as herein provided.  The Association or Board may designate a different address or addresses for notices to them, respectively, by giving written notice of such change of address to all Unit Owners.  Any Unit Owner may also designate a different address for notices to him by giving written notice of his change of address to the Board or Association.  Notices addressed as above shall be deemed delivered when mailed by United States registered or certified mail or when delivered in person with written acknowledgement of the receipt thereof, or if addressed to a Unit Owner, when deposited in his mailbox in the Building or at the door of his Unit in the Building.

3.  <u>Notice to Decedent</u>.  Notices required to be given any devisee or personal representative of a deceased Unit Owner may be delivered either personally or by mail to such party at his or its address appearing in the records of the court wherein the estate of such deceased Unit Owner is being administered.

4.  <u>Binding Effect</u>.  Each grantee of the Trustee, by acceptance of a deed of conveyance, or each purchaser under any contract for such deed of conveyance, accepts the same subject to all restrictions, conditions, covenants, reservations, liens and charges, and the jurisdiction, rights and powers created or reserved by this Declaration, and all rights, benefits and privileges of every character hereby granted, created, reserved or declared, and all impositions and obligations hereby imposed shall be deemed and taken to be covenants running with the land, and shall bind any person having at any time any interest or estate in the Property or any Unit, and shall inure to the benefit of such Unit Owner in like manner as though the provisions of the Declaration were recited and stipulated at length in each and every deed of conveyance.

5.  <u>Waiver</u>.  No covenants, restrictions, conditions, obligations, or provisions contained in this Declaration shall be deemed to have been abrogated or waived by reason of any failure to enforce the same, irrespective of the number of violations or breaches which may occur.

6.  <u>Amendment</u>.  Except as otherwise provided in the Act, this Declaration and By-Laws, the provisions of the Condominium Instruments may be amended, changed or modified by an instrument in writing setting forth such amendment, change or modification, signed and acknowledged by all of the members of the Board, at least three-fourths (3/4) of the Unit Owners and the approval

-26-

of any mortgagees required under the provisions of the Condominium Instruments, and containing an affidavit by an officer of the Board certifying that a copy of the amendment, change or modification has been mailed by certified mail to all mortgagees having bona fide liens of records against any Unit, not less than ten (10) days prior to the date of such affidavit. Any amendment, change or modification shall conform to the provisions of the Condominium Property Act and shall be effective upon recordation thereof. No change, modification or amendment which affects the rights, privileges or obligations of the Trustee or the Developer shall be effective without the prior written consent of the Trustee or the Developer. Except to the extent authorized by provisions of the Act, no amendment to the Condominium Instruments shall change the boundaries of any Unit or the undivided interest in the Common Elements, the number of votes in the Unit Owners' Association, or the liability for common expenses appertaining to a Unit.

7. <u>Invalidity</u>. The invalidity of any covenant, restriction, condition, limitation or any other provision of this Declaration, or of any part of the same, shall not impair or affect in any manner the validity, enforceability or effect of the remainder of this Declaration.

8. <u>Perpetuities and Restraints</u>. If any of the options, privileges, covenants or rights created by this Declaration would otherwise be unlawful or void for violation of (a) the rule against perpetuities or some analogous statutory provision, (b) the rules restricting restraints on alienation, or (c) any other statutory or common law rules imposing time limits, then such provision shall contin only until twenty-one (21) years after the death of the last to die of the now living lawful descendants of JAMES E. CARTER, JR., President of the United States, and CHARLES PERCY, Senator of the State of Illinois.

9. <u>Liens</u>. In the event any lien exists against two (2) or more Units and the indebtedness secured by such lien is due and payable, the Unit Owner of any such Unit so affected may remove such Unit and the undivided interest in the Common Elements appertaining thereto from such lien by payment of the proportional amount of such indebtedness attributable to such Unit. In the event such lien exists against the Units or against the Property, the amount of such proportional payment shall be computed on the basis of the percentage set forth in the Declaration. Upon payment as herein provided, it is the duty of the encumbrancer to execute and deliver to the Unit Owner a release of such Unit and the undivided interest in the Common Elements appertaining thereto from such lien.

The owner of such Unit shall not be liable for any claims, damages or judgments entered as a result of any action or inaction of the Board of Managers of the Association other than for mechanics' liens as hereinafter set forth. Each Unit Owner's liability for any judgment entered against the Board of Managers or the Association, if any, shall be limited to his proportionate share of the indebtedness as set forth herein, whether collection is sought through assessment or otherwise. A Unit Owner shall be liable for any claim, damage or judgment entered as a result of the use or operation of his Unit, or caused by his own conduct. Before conveying a Unit, a Developer shall record or furnish purchaser releases of all liens affecting that Unit and its Common Element interest which the purchaser does not expressly agree to take subject to or assume, or the Developer shall provide a surety bond or substitute collateral for or insurance against such liens. After conveyance of such Unit, no mechanics lien shall be created against such Unit or its Common Element interest by reason of any subsequent contract by the Developer to improve or make additions to the Property.

If, as a result of work expressly authorized by the Board of Managers, a mechanics' lien claim is placed against the Property or any portion of the Property, each Unit Owner shall be deemed to have expressly authorized it and consented thereto, and shall be liable for the payment of his Units' proportionate share of any due and payable indebtedness.

10. Release of Claims. Each Unit Owner hereby waives and releases any and all claims which he may have against any other Unit Owner, Occupant, the Association, its officers, members of the Board, the Trustee, the Developer, the managing agent, and their respective employees and agents for damage to the Common Elements, the Units, or to any personal property located in the Units or Common Elements, caused by fire or other casualty, to the extent that such damage is covered by fire or other form of casualty insurance.

11. Construction. The provisions of this Declaration shall be liberally construed to effectuate its purpose of creating a uniform plan for the operation of a first class condominium apartment building.

12. Headings. The headings and captions contained herein are inserted for convenient reference only and shall not be deemed to construe or limit the Sections and Articles to which they apply.

13. Land Trust Unit Owners Exculpation. In the event title to any Unit Ownership is conveyed to a land titleholding trust, under the terms of which all powers of management, operation and control of the Unit Ownership remain vested in the trust beneficiary or beneficiaries, then the Unit Ownership under such trust and the beneficiaries thereunder from time to time shall be responsible for payment of all obligations, liens, or indebtedness and for the performance of all agreement covenants and undertakings chargeable or created under this Declaration against such Unit Ownership. No claim shall be made against any such titleholding trustee personally for payment of any lien or obligation hereunder created and the trustee shall not be obligated to sequester funds or trust property to apply in whole or in part against such lien or obligation. The amount of such lien or obligation shall continue to be a charge or lien upon the Unit Ownership and the beneficiaries of such trust notwithstanding any transfers of the beneficial interest of any such trust or any transfers of title of such Unit Ownership.

14. Trustee Exculpation. This Declaration is executed by
BANK OF RAVENSWOOD

as aforesaid, in the exercise of power and authority conferred upon and vested in it as such Trustee (and said Trustee hereby warrants that it possesses full power and authority to execute this instrument). It is expressly understood and agreed by every person, firm or corporation hereafter claiming any interest under this Declaration that said Trustee as aforesaid, and not personally, has joined in the execution of this Declaration for the sole purpose of subjecting the titleholding interest and the trust estate under said Trust No. 25-3392 to the terms of this Declaration; that any and all obligations, duties covenants and agreements of every nature herein set forth by said Trustee as aforesaid, to be kept or performed, are intended to be kept, performed and discharged by the beneficiaries under said Trust or their successor, and not by said Trustee personally, and further, that no duty shall rest upon          BANK OF RAVENSWOOD

either personally or as such Trustee, to sequester trust assets, rentals, avails or proceeds of any kind, or otherwise to see to the fulfillment or discharge of any obligation, express or implied, arising under the terms of this Declaration, except where said Trustee is acting pursuant to direction as provided by the terms of said Trust, and after the Trustee has first been supplied with funds required for the purpose. In event of conflict between the terms of this paragraph and of the remainder of the Declaration on any question of apparent liability or obligation resting upon said Trustee, the exculpatory provisions hereof shall be controlling.

IN WITNESS WHEREOF, the said   BANK OF RAVENSWOOD
as Trustee as aforesaid and not individually, has caused its corporate seal to be affixed hereunto and caused its name to be signed in these presents by its

-28-

Assistant Vice President and attested by its Assistant Secretary, this _____ day
of _____, 19___.

                                    BANK OF RAVENSWOOD
                                    as Trustee as aforesaid, and not
                                    individually,

                                    BY: _____
                                           Assistant Vice President

ATTEST: _____
           Assistant Secretary

**The premises being vacant and not subject to any tenancies, no "Certificate
of Compliance" is required.**

STATE OF ILLINOIS    )
                     )  SS
COUNTY OF            )


        I, _____, a Notary Public in and fo
said County, in the State aforesaid, do hereby certify that _____
_____, Assistant Vice President of _____
_____, and
Assistant Secretary of said Bank who are personally known to me to be the same per
whose names are subscribed to the foregoing instrument as such Assistant Vice
President and Assistant Secretary, respectively, appeared before me this day in
person and acknowledged that they signed and delivered the said instrument as thei
own free and voluntary act and as the free and voluntary act of said Bank, as
Trustee as aforesaid, for the uses and purposes therein set forth; and the said
Assistant Secretary then and there acknowledged that he as custodian of the corpor
seal of said Bank, did affix the corporate seal of said Bank to said instrument as
his own free and voluntary act and as the free and voluntary act of said Bank, as
Trustee as aforesaid, for the uses and purposes therein set forth.

        GIVEN under my hand and notarial seal this _____ day of _____
A.D., 19___.


                                    _____
                                           NOTARY PUBLIC

My Commission Expires:_____


                                   -29-

EXHIBIT "B"

| Unit | Percentage of Ownership in the Common Elements |
|------|-----------------------------------------------|
| 1 | 33-1/3% |
| 2 | 33-1/3% |
| 3 | 33-1/3% |
| | 100.00% |

This document was prepared by:

ALEXANDER AND ALEXANDER
Attorneys At Law
180 North LaSalle Street
Chicago, Illinois  60601
726-0436.

86412043

AMENDMENT TO DECLARATION OF CONDOMINIUM
OWNERSHIP AND BY-LAWS
EASEMENTS, RESTRICTIONS AND COVENANTS
OF
1327 DEARBORN CONDOMINIUM

This Amendment to Declaration made by the Board of Managers of the 1327 Dearborn Condominium:

WITNESSETH THAT:

WHEREAS, that certain Declaration of Condominium Ownership dated June 22, 1978 and recorded on October 19, 1979 as Document 25200858 (the "Declaration") contains certain inaccuracies with respect to the number of Units located on the Property legally described on Exhibit A attached hereto and made a part hereof; and

WHEREAS, it is the desire and intention of the parties hereto to correct said inaccuracies to conform with the actual number of Units located on the Property.

NOW, THEREFORE, the Declaration is hereby amended to provide as follows:

1.  Article II, Paragraph 1 is hereby amended by deleting the word and numbers: "Units 1, 2, 3, 4" and substituting therefore, the word and numbers: "Units 1, 2, 3."

2.  Article III, Paragraph 3 is hereby amended by deleting the word and number "Unit 4" in the fourth line of said paragraph by substituting therefore the word and number "Unit 3".

3.  This Amendment is made pursuant to the provisions of the Condominium Property Act of the State of Illinois and Article XIX, paragraph 6 of the Declaration.

IN WITNESS WHEREOF, the undersigned have executed this Amendment this 22 day of AUG , 1986.

BOARD OF MANAGERS

PRINT NAME: CRAIG L. Uebele
PRESIDENT, SECRETARY,
+ TREASURER

Signed and Sworn To
Before Me This 22nd.
Day of August, 1986.

Notary Public

My Commission Expires August 21, 1987

PRINT NAME:

Signed and Sworn To
Before Me This ____
Day of August, 1986.

Notary Public

PRINT NAME: _____

Signed and Sworn To
Before Me This ____
Day of August, 1986.

_____
        Notary Public

OWNER, Unit 1
PRINT NAME: _____

Signed and Sworn To
Before Me This ____
Day of August, 1986.

_____
        Notary Public

OWNER, Unit 2
PRINT NAME: Bobbie Jo Topp

Signed and Sworn to
Before Me This ____
Day of August, 1986.

_____
        Notary Public

OWNER, Unit 3
PRINT NAME: CRAIG L. Vebele

Signed and Sworn To
Before Me This 12th
Day of August, 1986.

_____
        Notary Public
My Commission Expires August 31, 1987

This document was prepared by:

Margaret O. Allison
SACHNOFF WEAVER & RUBENSTEIN, LTD.
30 S. Wacker Drive
Suite 2900
Chicago, Illinois 60606
(312) 207-1000

-2-

EXHIBIT A

Lot 8 (except the South 98/100 of a foot thereof
and except that part falling in Greifenhagen's
Subdivision) in the Subdivision of Lot 6 in Bronson's
Addition to Chicago, in  Section 4, Township 39 North,
Range 14 East of the Third Principal Meridian, in
Cook County, Illinois.

86412043

AMENDMENT TO DECLARATION OF CONDOMINIUM
OWNERSHIP AND BY-LAWS
EASEMENTS, RESTRICTIONS AND COVENANTS
OF
1327 DEARBORN CONDOMINIUM

This Amendment to Declaration made by the Board of Managers of the 1327 Dearborn Condominium:

WITNESSETH THAT:

WHEREAS, that certain Declaration of Condominium Ownership dated June 22, 1978 and recorded on October 19, 1979 as Document 25200858 (the "Declaration") contains certain inaccuracies with respect to the number of Units located on the Property legally described on Exhibit A attached hereto and made a part hereof; and

WHEREAS, it is the desire and intention of the parties hereto to correct said inaccuracies to conform with the actual number of Units located on the Property.

NOW, THEREFORE, the Declaration is hereby amended to provide as follows:

1.  Article II, Paragraph 1 is hereby amended by deleting the word and numbers: "Units 1, 2, 3, 4" and substituting therefore, the word and numbers: "Units 1, 2, 3."

2.  Article III, Paragraph 3 is hereby amended by deleting the word and number "Unit 4" in the fourth line of said paragraph by substituting therefore the word and number "Unit 3".

3.  This Amendment is made pursuant to the provisions of the Condominium Property Act of the State of Illinois and Article XIX, paragraph 6 of the Declaration.

IN WITNESS WHEREOF, the undersigned have executed this Amendment this 22 day of AUG , 1986.

BOARD OF MANAGERS

PRINT NAME: CRAIG L. Uebele
PRESIDENT, SECRETARY, + TREASURER

Signed and Sworn To
Before Me This 22nd.
Day of August, 1986.

Notary Public

My Commission Expires August 21, 1987

PRINT NAME:

Signed and Sworn To
Before Me This ____
Day of August, 1986.

Notary Public

PRINT NAME: _____

Signed and Sworn To
Before Me This _____
Day of August, 1986.

_____
        Notary Public

_____

OWNER, Unit 1
PRINT NAME: _____

Signed and Sworn To
Before Me This _____
Day of August, 1986.

_____
        Notary Public

OWNER, Unit 2
PRINT NAME: Bobbie Jo Topp

Signed and Sworn to
Before Me This _____
Day of August, 1986.

_____
        Notary Public

OWNER, Unit 3
PRINT NAME: CRAIG L. Uebele

Signed and Sworn To
Before Me This _____
Day of August, 1986.

_____
        Notary Public
My Commission Expires August 31, 1987

This document was prepared by:

Margaret O. Allison
SACHNOFF WEAVER & RUBENSTEIN, LTD.
30 S. Wacker Drive
Suite 2900
Chicago, Illinois 60606
(312) 207-1000

-2-

EXHIBIT A

Lot 8 (except the South 98/100 of a foot thereof
and except that part falling in Greifenhagen's
Subdivision) in the Subdivision of Lot 6 in Bronson's
Addition to Chicago, in  Section 4, Township 39 North,
Range 14 East of the Third Principal Meridian, in
Cook County, Illinois.

AMENDMENT TO DECLARATION OF CONDOMINIUM
OWNERSHIP AND BY-LAWS
EASEMENTS, RESTRICTIONS AND COVENANTS
OF
1327 DEARBORN CONDOMINIUM

This Amendment to Declaration made by the Board of Managers of the 1327 Dearborn Condominium:

WITNESSETH THAT:

WHEREAS, that certain Declaration of Condominium Ownership dated June 22, 1978 and recorded on October 19, 1979 as Document 25200858 (the "Declaration") contains certain inaccuracies with respect to the number of Units located on the Property legally described on Exhibit A attached hereto and made a part hereof; and

WHEREAS, it is the desire and intention of the parties hereto to correct said inaccuracies to conform with the actual number of Units located on the Property.

NOW, THEREFORE, the Declaration is hereby amended to provide as follows:

1.    Article II, Paragraph 1 is hereby amended by deleting the word and numbers: "Units 1, 2, 3, 4" and substituting there-fore, the word and numbers: "Units 1, 2, 3."

2.    Article III, Paragraph 4 is hereby amended by deleting the word and number "Unit 4" in the fourth line of said paragraph by substituting therefore the word and number "Unit 3".

3.    This Amendment is made pursuant to the provisions of the Condominium Property Act of the State of Illinois and Article XIX, paragraph 6 of the Declaration.

IN WITNESS WHEREOF, the undersigned have executed this Amendment this __22__ day of __AUG__, 1986.

BOARD OF MANAGERS

PRINT NAME: _CRAIG L. Uebele_
PRESIDENT, SECRETARY, + TREASURER

Signed and Sworn To
Before Me This 22nd
Day of August, 1986.

_____
Notary Public
My Commission Expires August 31, 1987

PRINT NAME: _____

Signed and Sworn To
Before Me This ____
Day of August, 1986.

_____
Notary Public

PRINT NAME: _____

Signed and Sworn To
Before Me This ____
Day of August, 1986.

_____
     Notary Public

*Marjorie G. Mintz*

OWNER, Unit 1
PRINT NAME: _____

Signed and Sworn To
Before Me This 14th
Day of August, 1986.

_____
     Notary Public

OWNER, Unit 2
PRINT NAME: Bobbie Jo Topp

Signed and Sworn to
Before Me This 19th
Day of August, 1986.

_____
     Notary Public

OWNER, Unit 3
PRINT NAME: CRAIG L. Uebele

Signed and Sworn To
Before Me This 12th
Day of August, 1986.

_____
     Notary Public
     My Commission Expires August 31, 1987

This document was prepared by:

Margaret O. Allison
SACHNOFF WEAVER & RUBENSTEIN, LTD.
30 S. Wacker Drive
Suite 2900
Chicago, Illinois 60606
(312) 207-1000

-2-

EXHIBIT A

Lot 8 (except the South 98/100 of a foot thereof
and except that part falling in Greifenhagen's
Subdivision) in the Subdivision of Lot 6 in Bronson's
Addition to Chicago, in  Section 4, Township 39 North,
Range 14 East of the Third Principal Meridian, in
Cook County, Illinois.

Signed and Sworn To
Before Me This _____
Day of August, 1986.

_____
      Notary Public

86412043

AMENDMENT TO DECLARATION OF CONDOMINIUM
OWNERSHIP AND BY-LAWS
EASEMENTS, RESTRICTIONS AND COVENANTS
OF
1327 DEARBORN CONDOMINIUM

This Amendment to Declaration made by the Board of Managers of the 1327 Dearborn Condominium:

WITNESSETH THAT:

WHEREAS, that certain Declaration of Condominium Ownership dated June 22, 1978 and recorded on October 19, 1979 as Document 25200858 (the "Declaration") contains certain inaccuracies with respect to the number of Units located on the Property legally described on Exhibit A attached hereto and made a part hereof; and

WHEREAS, it is the desire and intention of the parties hereto to correct said inaccuracies to conform with the actual number of Units located on the Property.

NOW, THEREFORE, the Declaration is hereby amended to provide as follows:

1.  Article II, Paragraph 1 is hereby amended by deleting the word and numbers: "Units 1, 2, 3, 4" and substituting there-fore, the word and numbers: "Units 1, 2, 3."

2.  Article III, Paragraph 3 is hereby amended by deleting the word and number "Unit 4" in the fourth line of said paragraph by substituting therefore the word and number "Unit 3".

3.  This Amendment is made pursuant to the provisions of the Condominium Property Act of the State of Illinois and Article XIX, paragraph 6 of the Declaration.

IN WITNESS WHEREOF, the undersigned have executed this Amendment this 22 day of AUG , 1986.

BOARD OF MANAGERS

PRINT NAME: CRAIG L. Uebele
PRESIDENT, SECRETARY,
+ TREASURER

Signed and Sworn To
Before Me This 22nd
Day of August, 1986.

Notary Public

My Commission Expires August 21, 1987

PRINT NAME:

Signed and Sworn To
Before Me This ____
Day of August, 1986.

_____
Notary Public

PRINT NAME:

Signed and Sworn To
Before Me This ____
Day of August, 1986.

_____
        Notary Public

_Marjorie G. Mint_          _Sanford Mint_
                            OWNER, Unit 1
                            PRINT NAME:_____

Signed and Sworn To
Before Me This _14th_
Day of August, 1986.

_____
        Notary Public

                            _____
                            OWNER, Unit 2
                            PRINT NAME: Bobbie Jo Topp

Signed and Sworn to
Before Me This _1966_
Day of August, 1986.

_____
        Notary Public

                            _____
                            OWNER, Unit 3  CRAIG L. Uebele
                            PRINT NAME: CRAIG L. Uebele

Signed and Sworn To
Before Me This _12th_
Day of August, 1986.

_Henry C Ferran_
        Notary Public
        My Commission Expires August 31, 1987

This document was prepared by:

Margaret O. Allison
SACHNOFF WEAVER & RUBENSTEIN, LTD.
30 S. Wacker Drive
Suite 2900
Chicago, Illinois 60606
(312) 207-1000

EXHIBIT A

Lot 8 (except the South 98/100 of a foot thereof
and except that part falling in Greifenhagen's
Subdivision) in the Subdivision of Lot 6 in Bronson's
Addition to Chicago, in  Section 4, Township 39 North,
Range 14 East of the Third Principal Meridian, in
Cook County, Illinois.

86412043

AMENDMENT TO DECLARATION OF CONDOMINIUM
OWNERSHIP AND BY-LAWS
EASEMENTS, RESTRICTIONS AND COVENANTS
OF
1327 DEARBORN CONDOMINIUM

This Amendment to Declaration made by the Board of Managers
of the 1327 Dearborn Condominium:

WITNESSETH THAT:

WHEREAS, that certain Declaration of Condominium Ownership
dated June 22, 1978 and recorded on October 19, 1979 as Document
25200858 (the "Declaration") contains certain inaccuracies with
respect to the number of Units located on the Property legally
described on Exhibit A attached hereto and made a part hereof;
and

WHEREAS, it is the desire and intention of the parties
hereto to correct said inaccuracies to conform with the actual
number of Units located on the Property.

NOW, THEREFORE, the Declaration is hereby amended to provide
as follows:

1.    Article II, Paragraph 1 is hereby amended by deleting
the word and numbers: "Units 1, 2, 3, 4" and substituting there-
fore, the word and numbers: "Units 1, 2, 3."

2.    Article III, Paragraph 3 is hereby amended by deleting
the word and number "Unit 4" in the fourth line of said paragraph
by substituting therefore the word and number "Unit 3".

3.    This Amendment is made pursuant to the provisions of the
Condominium Property Act of the State of Illinois and Article
XIX, paragraph 6 of the Declaration.

IN WITNESS WHEREOF, the undersigned have executed this
Amendment this 22 day of AUG , 1986.

BOARD OF MANAGERS

PRINT NAME: CRAIG L. Uebele
PRESIDENT, SECRETARY,
+ TREASURER

Signed and Sworn To
Before Me This 22nd.
Day of August, 1986.

Notary Public
My Commission Expires August 21, 1987

PRINT NAME:

Signed and Sworn To
Before Me This ____
Day of August, 1986.

Notary Public

PRINT NAME: _____

Signed and Sworn To
Before Me This _____
Day of August, 1986.

_____
      Notary Public

        Margaret G. Mint              OWNER, Unit 1
                                      PRINT NAME: _____

Signed and Sworn To
Before Me This _____
Day of August, 1986.

_____
      Notary Public

                                      OWNER, Unit 2
                                      PRINT NAME: Bobbie Jo Topp

Signed and Sworn to
Before Me This _____
Day of August, 1986.

_____
      Notary Public

                                      OWNER, Unit 3 CRAIG L. Uebele.
                                      PRINT NAME: _____

Signed and Sworn To
Before Me This 12th
Day of August, 1986.

_____
      Notary Public
   My Commission Expires August 31, 1987

This document was prepared by:

Margaret O. Allison
SACHNOFF WEAVER & RUBENSTEIN, LTD.
30 S. Wacker Drive
Suite 2900
Chicago, Illinois 60606
(312) 207-1000

-2-

EXHIBIT A

Lot 8 (except the South 98/100 of a foot thereof
and except that part falling in Greifenhagen's
Subdivision) in the Subdivision of Lot 6 in Bronson's
Addition to Chicago, in  Section 4, Township 39 North,
Range 14 East of the Third Principal Meridian, in
Cook County, Illinois.



ORDER NO.
7-91-477

SURVEY SERVICE, INC.
*Registered Land Surveyors*

## PLAT OF SURVEY
*of*



UNIT 3

*upper elevation: 13.04*
*lower elevation: 49.53*

EXHIBIT A
PAGE 5 of 5
3RD FLOOR



*Jens K. Doe*

SURVEY SERVICE, INC.

*Registered Land Surveyors*

PLAT OF SURVEY

EXHIBIT A
PAGE 1 of 5

ARCHITECTURAL · INDUSTRIAL · LOTS · FARMS · SUBDIVISIONS · MORTGAGE · CONDOMINIUMS

*Jens K. Doe*

SURVEY SERVICE, INC.
*Registered Land Surveyors*

Phone:    775-0536
          775-0533

ORDER NO.   79/477
ORDERED BY  Ron Shipco

## PLAT OF SURVEY
*of*

LOT B ( EXCEPT THE SOUTH 98/100 OF A FOOT THEREOF AND EXCEPT THAT PART FALLING IN GNIEPENHAGEN'S SUBDIVISION ) IN THE SUBDIVISION OF LOT 6 IN BRONSON'S ADDITION TO CHICAGO, IN SECTION 4, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.



## EXHIBIT A
## PAGE 1 of 5

JENS K. DOE SURVEY SERVICE, INC., DO HEREBY CERTIFY THAT WE HAVE
SURVEYED THE ABOVE DESCRIBED PROPERTY AND THAT THE PLAT HEREON DRAWN CORRECTLY SHOWS THE RELATION OF
THE STRUCTURES TO THE PROPERTY LINES OF THE LAND AS INDICATED HEREON: THAT THE WALLS
ARE PLUMB AND THAT THERE ARE NO ENCROACHMENTS OF ADJOINING BUILDINGS OR STRUCTURES
OR OVERLAP OF BUILDINGS OR STRUCTURES FROM SAID LAND, ( except as noted )
/st    DAY OF  October    A.D. 1978

BY: _____  PRESIDENT
REGISTERED ILLINOIS LAND SURVEYOR    NO. 1575

THOMAS J. POPE
ILLINOIS
LAND SURVEYOR
NO. 1575
CHICAGO, ILLINOIS

*Jens K. Doe*

Phone. ??
??

ORDER NO.
*791477*

ORDERED BY
*Ron Shials*

SURVEY SERVICE, INC.

*Registered Land Surveyors*

# PLAT OF SURVEY

*of*

Horizontal Planes shown hereon are measured from top of finished floor to bottom of finished ceiling.

Interior Vertical Planes shown hereon are measured from, to and along interior finished face on exterior walls
to and along interior finished face on interior walls.
All exterior walls are 1.0 feet thick ( except as noted ) and shown thus: ――――――――――
All interior walls are 0.30 feet thick ( except as noted ) and shown thus: ═══════════

Elevations shown hereon are in relation to City of Chicago Standard Benchmark Number 31, located 105 feet North of the North
line of North Avenue and 8 feet East of the East line of Clark Street    Elevation is + 17.554 City of Chicago Datum
Upper elevation of unit shown on this page is + 59.40
Lower elevation of unit shown on this page is + 49.53



UNIT 3

upper elevation: 59.40
lower elevation: 49.53

North line of property
party wall is on line

South line of property

*EXHIBIT A*
*PAGE 5 of 5*
*3RD FLOOR*

THOMAS J. POPKE
ILLINOIS
LAND SURVEYOR
NO. 1573
CHICAGO, ILLINOIS

JENS K. DOE SURVEY SERVICE, INC., DO HEREBY CERTIFY THAT WE HAVE
ABOVE DESCRIBED PROPERTY AND THAT THE PLAT HEREON DRAWN CORRECTLY SHOWS THE RELATION OF
THE STRUCTURES TO THE PROPERTY LINES OF THE LAND AS INDICATED HEREON; THAT THE WALLS
ARE PLUMB AND THAT THERE ARE NO ENCROACHMENTS OF ADJOINING BUILDINGS OR STRUCTURES
NOR OVERLAP OF BUILDINGS OR STRUCTURES FROM SAID LAND ( except as noted – SEE PAGE 1 )
____ DAY OF _October_ A.D. 1976.

BY: _____ PRESIDENT

STATE OF ILLINOIS  )
                   ) ss:
COUNTY OF COOK     )

### AFFIDAVIT OF AN OFFICER OF
### BOARD OF MANAGERS FOR
### 1327 DEARBORN CONDONIMIUM

CRAIG L. Uebele , being duly sworn, deposes and says:

1.  I am an officer of the Board of Managers of the 1327 Dearborn Condominium (the "Board").

2.  The Declaration of Condominium Ownership and By-Laws, Easements, Restrictions and Covenants of 1327 Dearborn Condominium dated June 22, 1978 and recorded on October 19, 1979 as Document Number 25200858 (the "Declaration") contained certain inaccuracies with respect to a number of Units in the Property (as each such term is defined in the Declaration). Accordingly, an Amendment attached hereto as Exhibit A to the Declaration to correct the inaccurate reference has been executed by the members of the Board.

3.  In conformity with the provisions of Article XIX, Paragraph 6 of the Declaration, a copy of the Amendment has been mailed by certified mail to all mortgagees having liens of records against any Unit at least ten (10) days prior to the date hereof.

Signed and Sworn To
Before Me This 22ᵃ
Day of August, 1986.

Notary Public

My Commission Expires August 31, 1987